[No. A089432. First Dist., Div. Two. Dec. 11, 2000.]

KENNETH ASPLUND et al., Plaintiffs and Appellants, v.
SELECTED INVESTMENTS IN FINANCIAL EQUITIES, INC.,
Defendant and Respondent.

**COUNSEL**

McNichols Randick O'Dea & Tooliatos, Stephen McNichols, Jr., Donald A. Odell and Leslie A. Baxter for Plaintiffs and Appellants.

Jan Stiglitz for Defendant and Respondent.

## OPINION

**KLINE, P. J.**—The chief question in this case is whether a broker-dealer of securities has a common law duty to supervise sales by its registered representatives of investments in which the broker-dealer has no economic interest to persons who are not customers of the broker-dealer. We hold that where, as here, the registered representative is not an employee of the broker-dealer, has no actual or apparent authority to sell the investment at issue, and the broker had no notice of and did not in any way benefit from the transaction, the broker-dealer has no such duty.

### FACTS AND PROCEEDINGS BELOW

In 1996 and 1997, appellants Kenneth and Sandra Asplund and Marguerite Summers purchased promissory notes issued by Medco, Inc. (Medco), a Florida-based medical equipment company, from Joseph P. Tufo. Tufo was a registered representative of respondent Selected Investments in Financial Equities, Inc. (SIFE), a California corporation that is registered as an investment adviser with the Securities and Exchange Commission (SEC) and also as a broker-dealer with the National Association of Securities Dealers (NASD). SIFE's only purpose is to act as a management company for a mutual fund, the SIFE Trust Fund.

In October 1997 a federal court enjoined Medco from offering or selling promissory notes, which the SEC alleged to be "an elaborate Ponzi scheme" in violation of federal securities laws.[1] On June 24, 1997, the California Department of Corporations, acting under the authority of section 25532 of the Corporations Code, issued an order directing Medco, Tufo and others to desist and refrain from the further offer or sale in the State of California of investment contracts, promissory notes or any other securities of Medco on

---

[1]According to an SEC "Litigation Release," Medco and its president, Mark R. Blacher, "made material misrepresentations and omissions in connection with their sales of at least $16 million in promissory notes to the investing public. The notes promised investors returns of between 12% and 16% annually, depending upon the amount of the investment and the maturity of the note. The [SEC] complaint further alleges that Medco represented to investors that the notes were collateralized by used medical equipment which Medco purchased and then leased out to end-users such as doctors and clinics. According to the SEC's allegations, Medco is leasing only a fraction of the medical equipment it has claimed to be leasing. In fact, the SEC contends that one lessee, which purportedly was leasing medical equipment securing $1.6 million of investor funds, was a fictitious entity created by Blacher that had no leases, office space or real business. The SEC also contends that Medco significantly over-valued the medical equipment purportedly collateralizing investor funds. The SEC's complaint further alleges that Blacher lied about his professional background and that of Medco[]. The SEC also alleges that Medco wired at least $250,000 of investor funds to an off-shore bank account in Luxembourg."

the ground such securities were unqualified for sale in this state. Five months later SIFE terminated its relationship with Tufo, who was subsequently charged by the SEC with violating federal securities laws, and by the Department of Corporations for violating the California Corporations Code.

Medco eventually failed and was placed in receivership. As a result of their investments in Medco, appellants lost approximately $154,000.

Appellants commenced this action in March 1998 by filing a complaint against Tufo, his wife, and his family trust, naming also numerous Doe defendants. In May 1998 appellants amended their complaint by naming SIFE a defendant. In August 1998 Tufo filed for bankruptcy. Thereafter appellants dismissed their complaint as against him without prejudice.

All but one of appellants' seven causes of action against SIFE are based on a theory of vicarious liability. Alleging that Tufo had actual or ostensible authority to act in its behalf, appellants sought to impose vicarious liability on SIFE for misrepresentation, breach of fiduciary duty, fraud, negligence and breach of an oral contract. The remaining cause of action against SIFE asserted direct liability for negligent failure to supervise Tufo in his representative capacity.

In March 1999, SIFE moved for summary judgment claiming (1) that SIFE could not be found vicariously liable because Tufo's sales of investments in Medco were not within the scope of his agency relationship with SIFE, and (2) that direct liability could not be imposed because SIFE had no duty to supervise Tufo with respect to his sale of investment products such as Medco in which it had no financial interest, as such sales were outside the scope of its agency relationship with Tufo.

The trial court granted the motion for summary judgment on September 20, 1999, and on that basis thereafter entered judgment for SIFE.

Kenneth and Sandra Asplund first learned that Tufo offered investments in Medco from a radio advertisement. What impressed them was that the ad described a fully secured investment that returned a steady 12 to 16 percent annual return. They phoned Tufo for an appointment and met with him about five times. Tufo informed the Asplunds that in addition to selling investments he was an insurance agent with the Farmers Insurance Group. As to investments, he offered two "options." The first was to invest in the SIFE Trust Fund, which Tufo described as a mutual fund; the second was to purchase promissory notes in Medco. Tufo stated that Medco leased medical equipment to hospitals and physicians and that it was "a very safe investment" because the loan was secured by the equipment. He also said that,

unlike a mutual fund that goes up and down in value, the Medco notes produced "a steady 12 to 16 percent," depending upon the amount of the investment and the maturity date. After considering these options, the Asplunds decided Medco was the better investment and initially purchased promissory notes in the amount of $50,000. Thereafter, in order to receive returns greater than 12 percent, which required a higher investment, the Asplunds used money from a bank certificate of deposit and a checking account to invest an additional $48,000. The Asplunds lost all but $18,000 of their entire $98,000 investment.

Kenneth Asplund also recommended an investment in Medco to appellant Robert Summers, his uncle, who purchased Medco notes in the amount of $56,000 in May 1997, a few months before he died.[2] Summers apparently also lost all or most of this investment.

Sandra Asplund believed there was a relationship between SIFE and Medco because Tufo promoted investments in both and because his business card contained SIFE's name "in big bold letters, and the words 'Joseph Tufo, Registered Representative,' directly across from the SIFE logo." In a declaration, she stated that she reached this conclusion also because Tufo provided her and her husband with a chart showing the performance of the SIFE Trust Fund over 15 years, which stated in large print "Joseph P. Tufo Registered Representative," and he also provided them a copy of the SIFE 1995 annual report. The annual report commenced with the statement: "Going Strong: $600 million and growing" and listed the numerous financial institutions, other large corporations and United States treasury bills in which SIFE invested. The annual report also contained a section entitled "Additional SIFE Services" which stated that the SIFE Trust Fund provided "continuing individual services to the Investor," and stated that "[i]nquiries concerning any of SIFE's services may be directed to your representative or the home office. . . ." Based on the business card, the chart and the annual report, Mrs. Asplund "understood that Mr. Tufo was a registered representative of SIFE, and that he was advising us regarding investments offered by SIFE [and] that the options offered included Medco as well as the SIFE Trust Fund."

Carl Regalado, who also purchased Medco investments from Tufo,[3] testified at deposition that one of the reasons he was impressed with Tufo was

---

[2]Appellant Marguerite Summers is the mother and sole heir of Robert Summers and is participating in this action as her son's successor in interest. (Code Civ. Proc., § 377.11.)

[3]Regalado and his wife, Karen, also commenced a separate action against SIFE, which was subsequently consolidated with that of appellants.

his connection with SIFE. Regalado assumed Tufo was employed by SIFE which he knew to be "a very good company." He thought SIFE was the company he was dealing with, because "SIFE is an investment company, and that's what I—that's what this was all about." Because he thought SIFE was involved in the investment, Regalado "felt very comfortable."

Virginia Redler, an employee of Tufo and also an investor in both SIFE and Medco, testified at deposition that Tufo "got a lot of people into his other schemes by, you know, the legit thing of SIFE." Appellants never claimed, however, that Tufo ever explicitly represented that Medco was affiliated with SIFE, and Tufo testified that he never made any such representation.

Tufo was not an employee of SIFE but became a registered representative for the SIFE trust in 1985 or 1986. As a result of that relationship, Tufo was licensed by the NASD through SIFE.[4] The relationship between SIFE and Tufo was defined by the "Sales Representative Agreement" they entered into in 1993. By this agreement, SIFE appointed Tufo "as its agent for the sale and distribution of Participating Agreements of the Trust Fund, . . ." Paragraph 2.1 of the agreement stated "the parties' intention that Sales Representative [i.e., Tufo] shall be an independent contractor and not an employee of SIFE. Nothing in this Agreement shall create or be taken as evidence of an employer-employee relationship, an association, a partnership or a joint venture among the parties. Although Sales Representative is subject to the supervision and control of SIFE regarding the sales of Participating Agreements [i.e., shares or units in SIFE] in accordance with the terms and provisions of this Agreement and other rules and regulations regarding the sales of securities, Sales Representative shall determine the time, place and details of sales presentations to prospective investors. While Sales Representative is expected to devote substantial effort and time to the representation of SIFE, his/her status as an independent contractor requires that his/her hours of work, the percentage of time devoted to SIFE representation, and generally all details pertaining to Sales Representative's actual service be determined by Sales Representative."

Tufo's right to engage in other employment is also addressed in paragraph 8.1 of the agreement, which provided that, as an independent contractor, a sales representative "may engage in whatever other activities, including other employment" as he or she may desire. "Accordingly, Sales Representative may enter into other business activities or employments, such as tax

---

[4]"Sales representatives of broker-dealers must be registered with the NASD if the broker-dealer is a member of this self-regulatory organization." (*Hollinger v. Titan Capital Corp.* (9th Cir. 1990) 914 F.2d 1564, 1567.)

return preparation, accounting, the sales of personal or real property, mortgage brokering, insurance, business consulting, pension administration, legal services, etc. SIFE's only requirement is that Sales Representative keep all such other activities strictly separate from SIFE activities, that funds collected for SIFE never be commingled with funds from other activities, and that Sales Representative keep SIFE fully informed as to the nature of all such other employment or activities. The only limitation on this freedom of activity is that Sales Representative agrees not to undertake employment with any organization or business which is competitive with that of SIFE. Activities deemed competitive include, but are not limited to, investment advisory service, stock brokerage, mutual fund sales, and financial planning activity. Any exception to this broad prohibition against representation of competing business requires the prior specific consent in writing from SIFE."

In support of its opposition to the motion for summary judgment, appellants provided the transcript of an NASD arbitration proceeding (*Lopez v. SIFE*) regarding a dispute between SIFE and other investors also involving sales made by Tufo. In his testimony at that proceeding, Bruce Woods, the chief executive officer of SIFE, agreed that, despite language in the sales representative agreement describing Tufo as an independent contractor, "there's no such thing as an independent contractor for purposes of the NASD."

At the time he sold Medco promissory notes to appellants, Tufo believed the investment was sound; indeed he and his wife invested in Medco as did his secretary. Tufo did not think he needed SIFE approval to advertise and sell these investments because he felt Medco's promissory notes, which he was informed were secured by real property, were not "securities." Nevertheless, because he felt obliged to inform SIFE of all his business activities, he told SIFE, "in writing, that I was marketing the Medco product, and several of the managers there knew what I was doing because I told them. I tell everybody everything . . . [a]nd I gave them written notice." Tufo produced a photocopy of a letter he sent SIFE by facsimile on October 22, 1996 (a month before he sold appellants their initial investments in Medco), which stated, "I am marketing a private mortgage, MEDCO. They are a Florida based corporation. They are an asset-based lender/lessor and operator of sophisticated medical equipment for doctors, clinics, and hospitals. MEDCO offers a low risk/high return stable income program for its investors. . . . [¶] There is no pooling or fractionalization. Each investor receives an individual chattel mortgage, pledge of personal property, promissory note and UCC-1 filing. There is no sales charge or fee, front or back end. There is 30 day liquidity with a simple written notice for any reason whatsoever."

Tufo also produced two forms SIFE provided its registered representatives (an "annual certification" form and a "compliance meeting agenda for registered representatives") calling for disclosure of "outside activities," which he filled out on November 22, 1996, about a month after the letter he assertedly faxed SIFE. On both forms Tufo noted in writing that he offered his clients "promissory note programs."

SIFE made no inquiry about Tufo's sale of Medco investments until after the Department of Corporations issued its desist-and-refrain order concerning Medco. Woods acknowledged that he received the documents dated November 22, 1996, but he testified that no one at SIFE ever received the October, 1996 letter, and opined it was "bogus." He stated that if the letter had been received the Medco investment Tufo was offering would have been seen as competitive and Woods "would have asked Mr. Tufo to either give up that product or give up his licensure with SIFE."

Tufo vigorously denied the charge that the letter was a "bogus" attempt to shift blame to SIFE. He claimed that prior to June 1997 officers and employees of SIFE were fully aware of his activities in behalf of Medco, which he openly carried out in Walnut Creek, where SIFE was also located, and often asked him, "[h]ow is Medco going?" Tufo also gave tapes of his radio advertisements for Medco to Melinda Adams, an employee in SIFE's compliance office, and she helped him rewrite the copy. Woods, compliance officer John King and other SIFE officers acknowledged Tufo had always been forthcoming with information, that he stated on SIFE disclosure forms dated November 22, 1996, that he was offering "promissory note programs" to his clients, and that Tufo frequently advertised his sales of Medco notes on the radio and in the Contra Costa Times, and that SIFE should therefore have been aware of the "danger" to its interests and more promptly investigated the situation.

Woods testified at deposition that until the middle of 1997 Robert Lindemann was SIFE's compliance officer. In July of 1997, about a month after the Department of Corporations issued its desist-and-refrain order regarding Medco, Woods terminated Lindemann, because "[h]e never took on the responsibility of compliance for the registered representatives." Woods testified that during the period Lindemann failed to supervise the registered representatives, and until July 1997 when his assistant, John King, became compliance officer, Woods alone monitored registered representatives' compliance. John King was chiefly responsible for promulgating SIFE's compliance manual and convening periodic compliance meetings with registered representatives. Woods acknowledged that, prior to the desist-and-refrain

letter from the Department of Corporations, neither he nor King nor any other representative of SIFE ever inquired about Tufo's sale of investments in Medco or visited Tufo at his office.

Although SIFE's compliance manual reiterated an NASD rule that a registered representative shall not engage in "any business activity" outside the scope of his relationship with an NASD member such as SIFE " 'unless he has provided prompt written notice in order to clear approval by the member on a form as may be required,' " Woods did not believe NASD or SIFE required a registered representative who provided notice of an outside business activity to obtain approval in writing.

Woods justified his failure (and inferentially that of other SIFE compliance officers) to educate himself about Tufo's sales of Medco notes on the ground that under paragraph 8.1 of the sales representative agreement, "Mr. Tufo was clearly restricted to the sales of SIFE only and so the compliance with the distribution of SIFE was where I focused my attention since Joe was not authorized in any way to offer any other products." Woods acknowledged he initialed forms dated November 20, 1996, in which Tufo stated in writing that he offered his clients "two promissory note programs." When asked whether this disclosure "raise[d] any concerns that Joe Tufo may be involved in things he should not be involved with?" Woods responded: "If in 1996 anything that Mr. Tufo had given me raised concerns, we would have opened an investigation immediately."

In November 1996, the Department of Corporations issued a desist-and-refrain order prohibiting Simmons Financial, Inc. (Simmons), "and all persons acting in concert or participation with you," from offering for sale any promissory note or other securities of that company on the ground that such securities were unqualified for sale in California. A Simmons advertisement described the company as "a San Francisco Asset-Based Lending Firm licensed under the State of California's Finance and Lender's Law, and is bonded with a Surety Bond from a top-rated insurance company. In the last seven years, SFI has been privately raising funds by offering a one-year term account with a guaranteed 15% interest compounded quarterly." Simmons's advertisement named Tufo as an individual who could provide additional information and provided his address and phone number. Because of his involvement with Simmons, the Department of Corporations sent Tufo a copy of the desist-and-refrain order. Appellants contend SIFE either knew or should have known of this activity of its registered representative, which was a "red flag" indicating a need to closely supervise his activities. The record does not show SIFE was aware Tufo had been selling investments in Simmons until after the desist-and-refrain order relating to Medco.

In a declaration submitted in support of SIFE's motion for summary judgment, Woods reiterated that "SIFE has no connection whatsoever to MEDCO," and stated that "Tufo's agency with SIFE is limited to selling shares in the SIFE Trust Fund," and that "[n]either I nor any other SIFE officer or employee has ever expressly authorized Tufo to take any actions on SIFE's behalf, except as set forth in the Sales Representative Agreement . . . [and] did not authorize Tufo to sell investments in MEDCO," which was therefore "outside the scope of his agency with SIFE."

## Discussion

### I.

### *Standard of Review*

■ A trial court may grant summary judgment in a case if no triable issue exists as to a material fact, and if the papers submitted on the motion entitle the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c.) As was the case here, summary judgment proceedings may also raise questions of law.

■ " 'Where as in the case at bar, a *defendant* seeks summary judgment, his declaration and affidavits must either establish a complete defense to plaintiff's action or demonstrate an absence of an essential element of plaintiff's case. If defendant establishes the foregoing, and the plaintiff's declaration in reply does not show that there is a triable issue of fact with respect to that defense or that an essential element exists, the summary judgment should be granted. [Citation.]' " (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721], quoting *Dolquist v. City of Bellflower* (1987) 196 Cal.App.3d 261, 266 [241 Cal.Rptr. 706], original italics.)

■ A trial court ruling on a summary judgment motion is, of course, subject to de novo review by this court. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1116 [78 Cal.Rptr.2d 478].) Like the trial court, we must strictly construe the moving papers and liberally construe the materials offered in opposition. The evidence in support of and in opposition to the motion must be viewed in the light most favorable to the party against whom summary judgment was entered; due to the drastic nature of the procedure, all doubts about the propriety of granting the motion must be resolved in favor of its denial. (*Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d

785]; *Heredia v. Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1353-1354 [279 Cal.Rptr. 511]; *Stratton v. First Nat. Life Ins. Co., supra,* 210 Cal.App.3d at p. 1083.)

## II.

### *Discussion*

Appellants now advance three arguments. The first appears to be that the duty of a broker-dealer to supervise its registered representatives under federal securities law supports imposition of a like duty of care under California common law. The second is that Tufo's sales of Medco investments were within the scope of his employment with SIFE, and SIFE could therefore be liable on a theory of respondeat superior even if it did not authorize him to make the misrepresentations upon which appellants relied, as such misrepresentations are a foreseeable risk of doing business as a broker-dealer of securities. Finally, appellants claim the trial court erroneously excluded evidence that SIFE's failure to supervise Tufo was below the applicable standard of care.

We address these contentions in turn.

### A.

### *A Duty of Care Does Not Arise Under Federal Law.*

Appellants' argument in the trial court that SIFE violated the duty of a broker-dealer to supervise the work of its registered representatives was predicated primarily on California common law.[5] The trial court rejected this argument, predicating its analysis with the following formulation of the issue: "The issue of whether or not a cause of action can be stated for negligent supervision rests upon the special question of whether the duty of supervision for a registered securities broker-dealer extends to all of the activities of that representative or only to those securities which the broker-dealer entrusts the representative to sell. In other words, if the representative has neither actual nor ostensible authority to sell other securities on behalf of the broker-dealer, may the latter nonetheless have a duty to supervise him or her in the event that he or she chooses, with the broker-dealer's blessing, to sell other securities. Plaintiffs have established that Tufo was so registered

[5]Appellants then relied on *Twomey v. Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 709 [69 Cal.Rptr. 222] and *Duffy v. Cavalier* (1989) 215 Cal.App.3d 1517 [264 Cal.Rptr. 740], which imposed a fiduciary duty on a broker under circumstances manifestly different from those of the present case.

and that SIFE did not supervise him as to activities other than the selling of SIFE securities. The motion will therefore be determined based upon the legal conclusion as to whether such a duty of supervision does or does not exist."

The trial court then stated that, as neither party contended that there is a common law duty to supervise an independent contractor, "[t]he question, then, is whether the special relationship of a registered agent for the sale of securities and the broker-dealer under whose registration the agent is registered, creates such a duty as to activities of the salesperson which relates to securities transactions in which the broker-dealer has no interest." After observing that it was unable to locate any California appellate authority addressing this issue, the court considered appellants' arguments that the duty in question arose under subdivision (g) of section 25212 of the California Corporations Code and regulations promulgated by the Commissioner of Corporations. Section 25212, subdivision (g) provides in pertinent part that a broker-dealer may be disciplined if, among other things, it "has failed reasonably to supervise . . . another person who commits a violation [of statutes, rules or regulations], if the other person is subject to his or her supervision . . . ." The trial court concluded that this statute only applies in situations in which there is a preexisting responsibility to supervise, and therefore does not create such a duty.

Appellants also claimed that a duty to supervise was created by a regulation implementing section 25218 of the Corporations Code. Section 25218 states in material part that "[n]o broker-dealer . . . shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state in contravention of such rules as the commissioner [of corporations] may prescribe designed . . . to protect investors and the public interest . . . ." The implementing regulation appellants relied upon simply states that "[e]very broker-dealer shall exercise diligent supervision over the securities activities of all of its agents." (Cal. Code Regs., tit. 10, § 260.218.4, subd. (a).) The trial court rejected the argument that the regulation created a duty to supervise, relying on *California Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166 [73 Cal.Rptr.2d 182], which held that "an administrative agency cannot independently impose a duty of care if that authority has not been properly delegated to the agency by the Legislature." (*Id.* at p. 1175.) The court agreed that the Legislature has the power to require broker-dealers to supervise their registered agents, and may delegate to the commissioner of corporations the

responsibility to define the scope of that duty, but concluded that at this time the Legislature has not made such a delegation.[6]

Appellants do not in this court renew the contentions that the duty of a broker-dealer to supervise its registered representatives arises under a California statute or regulation, which we believe the trial court properly rejected. ■ Appellants' chief contention now is that because the sale of securities and the activities of broker-dealers are activities regulated primarily by federal law, "the federal standards govern, preempting any conflicting state law." According to appellants, "[f]ederal law indicates that a Broker-Dealer such as SIFE has a duty to supervise *all* of its representatives' securities transactions." This is a curious argument.

For one thing appellants do not suggest there is in fact any conflict between applicable state and federal law; furthermore appellants never pleaded a federal cause of action. We understand appellants to be arguing that federal securities law—in particular, section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t)—may be adopted as a standard of care in a state negligence action either where, as here, the broker-dealer has adopted the federal securities law requirements as its own personal standard, or under the doctrine of negligence per se.[7] (See *Satterlee v. Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 588 [177 P.2d 279] ["if the evidence establishes that the plaintiff's or defendant's violation of the statute or ordinance proximately caused the injury and no excuse or justification for violation is shown by the evidence, responsibility may be fixed upon the violator without other proof of failure to exercise due care"].)

---

[6]The court concluded that "[Corporations Code] section 25218 was intended to govern the activities of the broker-dealer in the purchase and sale of securities and not to determine the standard of care required as to supervising separate securities activities of an independent agent which are outside of the scope of that agent[']s engagement."

[7]Evidence Code section 669 codified the doctrine of negligence per se as a presumption affecting the burden of proof. The section provides in material part that:

"(a) The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"(b) The presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; or

"(2) The person violating the statute, ordinance, or regulation was a child . . . ."

Like the trial court, we do not believe SIFE subjected itself to the requirements of federal (or state) securities laws with respect to its responsibility to supervise the outside activities of its registered representatives. Appellants appear to be basing their claim on the theory that the sales representative agreement allows SIFE's registered representatives to sell outside (i.e., non-SIFE) investments if it provides notice of such proposed sales and SIFE does not object in writing. Appellants suggest the allowance of outside sales and the notice requirement shows that SIFE "embraced all federal and state securities laws [and NASD rules] as its own personal standard," and that for this reason appellants have a "right to use the NASD rules and other federal law to support their tort claims against SIFE."

Not surprisingly, SIFE characterizes the provision very differently, seeing it not as a grant of but a limitation on the authority of registered representatives. According to SIFE, the purpose of the provision is not to incorporate federal and state securities laws or NASD rules into the agreement but simply to prevent registered representatives from selling competing investments. The trial court agreed with SIFE, stating that "[p]laintiff misconstrues the contract provision, which is a 'competition' agreement not an 'agency authority' provision. By barring its sales representatives from competing with SIFE absent the company agreeing that they may do so, the company is not agreeing that they may do so, the company is not agreeing that where it allows such competition the representative becomes its agent in all of such activity. Such an interpretation would be irrational in light of the clear language of the agreement to the contrary." We agree with the trial court. Neither the sales agreement nor anything else in the record suggests SIFE desired or felt obliged to adopt the supervisory requirements of federal or state securities laws, or the rules of the NASD, with respect to the sales by its representatives of competing investment products.

We are mindful that there is authority for the proposition that a violation of a federal statute may, in certain circumstances, be adopted as a standard of care (see, e.g., *Sierra-Bay Fed. Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 332 [277 Cal.Rptr. 753]; *Toole v. Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 703-704 [60 Cal.Rptr. 398, 29 A.L.R.3d 988]); but adopting a standard of care is significantly different from imposing a common law duty that would not otherwise exist.[8] In any case, it is

---

[8] With respect to appellants' attempt to predicate their claims also on the violation of NASD rules, see *In re VeriFone Securities Litigation* (9th Cir. 1993) 11 F.3d 865, holding that a private cause of action for violation of the reporting and disclosure requirements governing members of the NASD and the New York and American Stock Exchanges cannot be allowed, because "[i]t is well established that violation of an exchange rule will not support a private claim." (*Id.* at p. 870, citing *Jablon v. Dean Witter & Co.* (9th Cir. 1980) 614 F.2d 677, 680-681.)

enough for us to conclude, as we do, that the facts of this case do not establish a violation of federal securities law. *Hollinger v. Titan Capital Corp., supra*, 914 F.2d 1564, and *Hauser v. Farrell* (9th Cir. 1992) 14 F.3d 1338, the federal cases appellants primarily rely upon, impose no responsibility on a broker-dealer to supervise sales to persons with whom it has no relationship of securities in which it has no economic interest.

*Hollinger v. Titan Capital Corp., supra*, 914 F.2d 1564, was a securities fraud action by investors against a broker-dealer and a financial counseling firm, seeking to recover for a registered representative's embezzlement of money entrusted to him. The trial court granted summary judgment for both defendants. The issue in *Hollinger* germane to the case before us was whether Titan, the defendant broker-dealer, could be held vicariously liable as a "controlling person" under section 20(a) of the Securities Exchange Act of 1934, which with certain exceptions extends vicarious liability of brokerage firms beyond common law respondeat superior liability: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." (15 U.S.C. § 78t(a).) The district court felt Titan was not a "controlling person" within the meaning of the statute unless it exercised "actual power or influence" over the fraudulent dealings of Wilkowski, the registered representative, and was a "culpable participant" in his fraudulent dealings. It concluded Titan had no "power or influence" over Wilkowski because he was an independent contractor, Titan exercised no control over his defalcation of funds, did not benefit from that defalcation, and did not authorize Wilkowski to receive personal checks. The district court also determined that because Titan and Wilkowski had agreed that the latter would be an independent contractor, "Titan had no duty to supervise unauthorized and unknown transactions and therefore could not have been a 'culpable participant' in Wilkowski's misdeeds." (914 F.2d at pp. 1572-1573.) The district court "made the question of whether Titan controlled Wilkowski turn on the particular business arrangement of the parties." (*Id.* at p. 1573.)

The Ninth Circuit rejected the district court's reasoning and conclusion, holding that "a broker-dealer is a controlling person under § 20(a) with respect to its registered representatives." (*Hollinger v. Titan Capital Corp.,*

*supra*, 914 F.2d at p. 1573.) The court emphasized that that statute was designed to protect the investing public from representatives who were inadequately supervised or controlled. Purchasers of securities often rely heavily for investment advice on the broker's representative, and because representatives are usually compensated by commissions that are proportional to sales there is an "ever present" temptation to take advantage of the client. To ensure diligent supervision and control, Congress held broker-dealers vicariously liable for injury to investors caused by violations of the statute or rules promulgated thereunder. "The very nature of the securities business, as it has developed in this country, militates for such a rule as public policy and would seem to suggest strict court enforcement." (*Ibid.*) Because the securities laws impose on broker-dealers a duty to supervise their registered representatives, and the representatives need the dealers to gain access to the securities markets, the *Hollinger* court held that, as a matter of law, a broker-dealer is a "controlling person" under the Securities Exchange Act of 1934 with respect to its registered representatives. Significantly, the court refused to make any distinction between employees or other agents of a broker-dealer and independent contractors, stating that "[t]o exclude from the definition of controlling person those registered representatives who might technically be called independent contractors would be an unduly restrictive reading of the statute and would tend to frustrate Congress' goal of protecting investors. Thus, we reject the argument that broker-dealers can avoid a duty to supervise simply by entering into a contract that purports to make the representative, who is not himself registered under the Act as a broker-dealer, an 'independent contractor.' " (914 F.2d at p. 1574.)

However, the *Hollinger* court also explained that a broker-dealer is not necessarily liable "for all actions taken by its registered representatives," and is not an insurer for its representatives. *(Hollinger v. Titan Capital Corp., supra*, 914 F.2d at p. 1574.) Section 20(a) provides that a "controlling person" is liable, "unless [he] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." (15 U.S.C. § 78t(a).) The burden to establish good faith rests with the broker-dealer once it is shown to be a controlling person, and it cannot satisfy this burden "merely by saying that it has supervisory procedures in place, and therefore, it has fulfilled its duty to supervise. A broker-dealer can establish the good faith defense only by proving that it 'maintained and enforced a reasonable and proper system of supervision and internal control.' " (914 F.2d at p. 1576, quoting *Zweig v. Hearst Corp.*

(9th Cir. 1975) 521 F.2d 1129, 1134-1135, cert. den., 423 U.S. 1025 [96 S.Ct. 469, 46 L.Ed.2d 399].)[9]

For the foregoing reasons, the *Hollinger* court concluded that the district court erred in ruling Titan had satisfied its duty to discharge because it had adopted rules for accepting investment payments and for supervising a contractor's compliance with securities laws and regulations. (*Hollinger v. Titan Capital Corp., supra,* 914 F.2d at p. 1576.) "Should Titan choose to rely upon the good faith defense, then it must carry its burden of persuasion that its supervisory system was adequate and that it reasonably discharged its responsibilities under the system." (*Ibid.*)

The Ninth Circuit refined its reasoning in *Hollinger* in *Hauser v. Farrell, supra,* 14 F.3d 1338, which considered what conduct by a representative is "outside of the broker-dealer's statutory control." In that case the plaintiffs, Hauser and Acosta, invested in a partnership, intended to be incorporated, called "New Technologies in Energy" (NTE), with two stockbrokers, Harvey and Farrell, employed at Rauscher/Pierce, a securities brokerage firm. When the venture failed the plaintiffs sued the stockbrokers and the firm. The complaint alleged that Harvey and Farrell had violated rule 10b-5 of the SEC (17 C.F.R. § 240.106) by misrepresenting certain facts about the investment in NTE. Rauscher/Pierce was alleged to be liable as an aider and abettor of the rule 10b-5 violation, as a "controlling person" under section 20(a) (15 U.S.C. 78t), and under the theory of respondeat superior. The district court

---

[9]*Hollinger* also held that Congress did not intend the vicarious liability of a "controlling person" under section 20(a) (15 U.S.C. § 78t) of the Securities Exchange Act of 1934 to supplant the doctrine of respondeat superior or other agency principles. "[I]n enacting § 20(a), Congress expanded upon the common law, and in doing so, created a defense (the good faith defense) that would be available only to those who, under common law principles of respondeat superior, would have faced no liability at all. Only if both respondeat superior and § 20(a) are available is the statutory scheme comprehensive and the public protected by the federal securities laws. 'To allow a brokerage firm to avoid secondary liability simply by showing ignorance, purposeful or negligent, of the acts of its registered representative contravenes Congress' intent to protect the public, particularly unsophisticated investors, from fraudulent practices.' " (*Hollinger v. Titan Capital Corp., supra,* 914 F.2d at p. 1577, quoting *Paul F. Newton & Co. v. Texas Commerce* (5th Cir. 1980) 630 F.2d 1111, 1118-1119.) Dissenting from the majority opinion in *Hollinger,* Judge Cynthia Holcomb Hall "would hold that section 20(a) of the Act, which already imposes vicarious liability upon all employers for the fraudulent acts of their employees, precludes the grafting of the common law doctrine of respondeat superior onto a federal securities law action. The inclusion in the securities laws of statutory provisions which expressly impose controlling person liability indicates that Congress intended to exclude other forms of vicarious liability. If we impose secondary liability under respondeat superior on Titan for Wilkowski's rule 10b-5 fraud, we effectively nullify the exculpatory provision of section 20(a) as well as the scienter element of a 10(b) claim." (*Hollinger,* at p. 1579 (dis. opn. of Hall, J.).)

granted the brokerage firm's motion for summary judgment on all of these claims and the Ninth Circuit affirmed.

The Ninth Circuit agreed with the district court that the transaction at issue was an "outside" transaction for purposes of controlling person liability. First, it was not the type of securities transaction that could only be performed through Harvey's and Farrell's association with a broker-dealer; second, the investment in NTE was unrelated to any of the securities offered by the broker-dealer through its registered agents; third, Harvey and Farrell were not acting in their capacity as registered agents of Rauscher/Pierce when they approached the plaintiffs with their investment in NTE. (*Hollinger v. Farrell, supra,* 14 F.3d at p. 1341.) The court also noted that "Rauscher/Pierce has never had an interest in the venture. There has been no evidence offered to suggest that Rauscher/Pierce even had any meaningful knowledge of the scheme or that it was the type of transaction that Rauscher/Pierce dealt with or had an interest in at all as a brokerage house. In fact it was not. Rather the NTE 'deal' was a separate arrangement entered into by the co-defendants as private individuals, not as 'registered agents' of Rauscher/Pierce. As such, that scheme and any related transactions fell outside the scope of that activity that Rauscher/Pierce, as a broker, is statutorily required to supervise." (*Id.* at pp. 1341-1342.)[10]

Almost all the foregoing considerations are present in this case. Tufo was not acting in his capacity as a registered representative for SIFE when he sold appellants investments in Medco, which are unrelated to the mutual fund SIFE markets through its registered representatives. SIFE has no economic or other interest in Medco, and investments in Medco compete with those SIFE offers the public. Tufo's authority to market investments in Medco did not derive from SIFE.[11] Moreover, unlike the registered representatives in *Hauser,* Tufo never met with investors in the broker-dealer's

---

[10]After *Hauser* was decided, the United States Supreme Court held, in *Central Bank of Denver N.A. v. First Interstate Bank of Denver* (1994) 511 U.S. 164, 191 [114 S.Ct. 1439, 1455, 128 L.Ed.2d 119], that a private plaintiff may not maintain an action for aiding and abetting violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) because the text of section 10(b) does not prohibit aiding and abetting. Shortly thereafter, Congress enacted section 104 of the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78t), which restored the SEC's authority—to the extent it was put into question by the *Central Bank of Denver* case—to bring actions against defendants who aid and abet violations of certain securities laws. (*U.S. S.E.C. v. Fehn* (9th Cir. 1996) 97 F.3d 1276, 1283-1284.) The new provision did not, however, reinstate a private right of action for aiding and abetting violations of section 10(b). (97 F.3d at p. 1284.)

[11]Tufo testified that, based on advice he had received, he did not believe the Medco investment he marketed was a "security" within the meaning of federal securities law. However, even if, as appears, the investments were securities under the test articulated by the

office, and for that reason (and others) it cannot be argued that he exploited his relationship with the broker-dealer more than they did. While there may be a triable issue as to whether the letter Tufo claimed he sent SIFE on October 22, 1996, provided "meaningful information" about Medco, that information would not in and of itself trigger a duty under federal securities laws, because the letter did not suggest SIFE had an interest in the investment (other than the fact that it competed with SIFE's investment, which is not an interest protected under federal securities laws). In short, as we see it, SIFE would not be held vicariously liable under section 20(a) (15 U.S.C. 78t).

Since a violation of federal securities law has not been established, the doctrine of negligence per se does not come into play in this case, even indulging the dubious theory that the violation of a federal statute or regulation can be employed under the doctrine not simply to define the standard of care but to impose a duty that would not otherwise exist under state law.

B.

*Tufo Was Not an Employee of SIFE and the Doctrine of Respondeat Superior Is Inapplicable.*

■  Appellant's attempt to impose vicarious liability under the doctrine of respondeat superior consists of an amalgamation of reasons Tufo should be considered an employee of SIFE despite contrary provisions of the sales representative agreement, the main reason being that Tufo had actual authority to sell non-SIFE investments.

The trial court concluded that "[t]here is no triable issue of fact as to whether Tufo had actual authority to act on behalf of SIFE in dealing with Plaintiffs with reference to MEDCO promissory notes. The Sales Representative Agreement between Tufo and SIFE expressly limits Tufo's authority to the selling of SIFE investments. Plaintiffs present no evidence that establish[es] any other actual grant of authority." Appellants challenge the determination that Tufo had no actual authority to sell Medco investments on

United States Supreme Court (*Reves v. Ernst & Young* (1990) 494 U.S. 56, 63 [110 S.Ct. 945, 950, 108 L.Ed.2d 47]), it is enough that Tufo did not have access to those investments only by reason of his relationship with SIFE. (*Hollinger v. Titan Capital Corp., supra,* 914 F.2d at pp. 1575-1576, fn. 26.)

behalf of SIFE,[12] claiming that the evidence shows "SIFE not only authorized Tufo to sell products other than the SIFE investment recited in the [sales representative agreement], but encouraged him to do so," and that it is therefore "questionable . . . whether the Sales Representative Agreement has any effect at all." The evidence appellants seize upon does not support the claim "that Tufo had SIFE's tacit approval to market MEDCO to the public."

At one point during his lengthy deposition, Bruce Woods stated that between November and early December of 1996, SIFE prepared for sale a so-called "wrap product"[13] known as the "SIFE Seven Seas Global Advisors Money Market Fund." Tufo, during the course of his deposition, recalled being authorized to sell this new money market fund, though the verbal authorization was never put in writing. This evidence does not contradict the trial court's manifestly correct finding that the sales representative agreement limited Tufo's authority "to the selling of SIFE investments."

Appellants also attempt to buttress the argument that the sales representative agreement did not truly define the relationship between SIFE and Tufo by claiming that such an agreement cannot operate to relieve a broker-dealer of the supervisory requirements imposed by federal securities laws and regulations, as well as NASD rules, because those requirements apply not just to employees but as well to independent contractors. This argument is, of course, simply a different way of advancing the argument that a common law duty of care should be predicated on the federal statutory standard of care, which we have already rejected.

Appellants' related claim, that "Tufo's tortious sale of MEDCO [was] committed within the scope of his employment as a Registered Representative of SIFE," is no more than a reformulation of the claim that Tufo had

---

[12]Appellants do not, however, challenge the trial court's determination that Tufo also lacked ostensible authority to sell Medco investments on behalf of SIFE. Presumably, appellants now accept that Tufo lacked ostensible authority because the act or declaration of the putative agent alone can never establish ostensible authority; there must be some conduct on the part of the alleged principal. (*Barclay Kitchen, Inc. v. California Bank* (1962) 208 Cal.App.2d 347, 353 [25 Cal.Rptr. 383]; *Torrance Nat. Bank v. Enesco Federal Credit Union* (1955) 134 Cal.App.2d 316, 322 [285 P.2d 737]; see also *Petersen v. Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445 [277 Cal.Rptr. 468].) Appellants produced no evidence of any act or representation on the part of SIFE suggesting that Tufo marketed or sold Medco investments on its behalf.

[13]Woods testified that "in industry lingo, a wrap fund means that your prospectus cover goes over the prospectus of the fund and so it is actually marketed as the SIFE money market fund." In context, it is clear Woods was explaining that the SIFE prospectus cover would be used in place of that used by Seven Seas Global Advisors, the organization that managed the money market fund at issue.

actual authority to sell Medco investments. Appellants say the trial court was wrong in concluding there was no evidence of such authority, because "[t]he only avenue through which Tufo could sell MEDCO was through SIFE. SIFE, as Tufo's Broker-Dealer, has the responsibility to oversee Tufo's sale of securities. Where the employer places the employee in the position of being able to perpetrate the fraud, vicarious liability will be found. . . . [Additionally,] SIFE should have foreseen the risk that its Registered Representative, Tufo, would sell unqualified, unstable securities, and, if not properly supervised, would misrepresent their value as an investment."

The sole authority appellants produce in support of this argument is *Inter Mountain Mortg., Inc. v. Sulimen* (2000) 78 Cal.App.4th 1434 [93 Cal.Rptr.2d 790]. The case does not support the argument.

*Inter Mountain Mortg., Inc.* was an action against a licensed real estate broker by a mortgage loan broker that processed a fraudulent loan submitted by a licensed real estate agent employed by the defendants. The court of appeal reversed a grant of summary judgment for the defendants, finding that not only was there evidence of agency, but that a finding of agency was not even required in light of the evidence that the agent was employed by the defendants at the time the loan application was submitted on one defendant's loan application form. (*Inter Mountain Mortg., Inc. v. Sulimen, supra,* 78 Cal.App.4th at p. 1440.) Also, an employee of the plaintiff testified that Baskaron, the agent, affirmatively represented to her that he was a loan representative and real estate agent for the defendants and, based on such representations, she processed the loan. (*Id.* at p. 1442.) Because Baskaron led the plaintiff loan broker's employee "to believe that when he submitted the Brown loan to Inter Mountain Mortgage, he was performing his job duties as an American Frontier loan representative . . . a nexus existed between Baskaron's alleged tort, the fraudulent loan transaction, and his employment as a loan representative. The risk of one of defendants' loan representatives submitting a fraudulent loan application, such as the Brown loan application, was a generally foreseeable risk inherent and incidental to defendants' mortgage loan brokerage business. Baskaron's employment as a loan representative placed him in the position of being able to submit fraudulent loan applications. Such an occurrence was ' "not so unusual or startling that it would seem unfair to include the loss resulting from it among the other costs of the employer's business." ' " (*Ibid.,* quoting *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 299 [48 Cal.Rptr.2d 510, 907 P.2d 358].) The Court of Appeal stated that even though there may have been conflicting evidence that Baskaron did not commit fraud, was not employed by the defendants at the time of the loan

transaction, and was not at that time acting within the scope of his employment during the transaction, "there was sufficient evidence to the contrary, raising triable issues as to whether defendants are vicariously liable for Baskaron's alleged fraudulent conduct." (*Inter Mountain Mortg., Inc. v. Sulimen, supra,* 78 Cal.App.4th at p. 1442.)

The evidence that Tufo was acting within the scope of his employment does not approach that presented in *Inter Mountain Mortg., Inc.* First of all, there was not in *Inter Mountain Mortg., Inc.,* as there is here, an employment agreement describing the putative employee as an independent contractor, and explicitly limiting the scope of the agent's authority. Furthermore, the agent in *Inter Mountain Mortg., Inc.* affirmatively represented to the plaintiff that he had authority to act in behalf of the defendant, California Department of Real Estate public records showed he was employed by that defendant at the time of the transaction, and Baskaron produced documents, including an appraisal of the property in question, prepared by or for the defendants. (*Inter Mountain Mortg., Inc. v. Sulimen, supra,* 78 Cal.App.4th at p. 1438.) There is no such evidence here. On the contrary, Tufo stated that he never told appellants or others that SIFE sponsored or promoted Medco investments. The only similarity between this case and *Inter Mountain Mortg., Inc.* is that, like Baskaron, Tufo was an agent of the defendant principal. However, the absence of any evidence of actual or ostensible authority beyond that specified in the sales representative agreement dispositively distinguishes this case from *Inter Mountain Mortg., Inc.*

As the trial court stated, "[p]laintiffs set forth, in their 74 statements of disputed facts, only 2 facts that in any manner relate to acts of SIFE which could be contended to 'cause or allow a third person to believe' the existence of an agency relationship. In item '8' they allege that Tufo used a business card that identified him as a 'registered agent' of SIFE (although there is no evidence presented that SIFE either prepared, had prepared or knew of that card) and in items '12' and '26' they allege that he had an undescribed 'plaque' on the wall of his office from SIFE. Without more, these two items are insufficient to cause or allow a reasonable person to expect that Tufo, working out of his own Farmers Insurance sales office, has been granted an all encompassing agency covering whatever products Tufo may cho[o]se to sell." This determination, which is supported by the law (see, e.g., *Curtis v. Hannaford & Talbot* (1965) 236 Cal.App.2d 182, 184 [45 Cal.Rptr. 785]) and by the record, was correct. This case is not one in which the broker represented to the plaintiff that its agent had authority to manage his account (see, e.g., *Kahn v. Gordon* (1967) 249 Cal.App.2d 722 [57 Cal.Rptr. 725]), or the defendant broker knew of or benefited in some way from the fraudulent

transaction (see, e.g., *Blackburn v. Dean Witter* (1962) 201 Cal.App.2d 518 [19 Cal.Rptr. 842], *Walsh v. Hooker & Fay* (1963) 212 Cal.App.2d 450 [28 Cal.Rptr. 16]), or the principal knew of the fraudulent transaction as it was taking place and did not disavow the agent's authority to act on its behalf. (*Reusche v. California Pacific Title Ins. Co.* (1965) 231 Cal.App.2d 731, 737 [42 Cal.Rptr. 262].) Here, the limitations set forth in the sales representatives agreement, coupled with the absence of substantial evidence of apparent or actual authority beyond that specified in the agreement, eliminates any basis upon which to impose vicarious liability on SIFE under the doctrine of respondeat superior.

## C.

### *The Trial Court Did Not Erroneously Exclude Evidence.*

Appellants submitted to the court the declaration of Marvin G. Breen, their "designated expert witness" on securities regulation. Mr. Breen had been involved in the securities industry for 44 years, and was, among other things, chairman of the ethics and business conduct committee of the Pacific Stock Exchange, and was familiar with the "statutes, rules, regulations, standards and practices which are at issue in this matter." His declaration includes a description of NASD rule 3010(a), which relates to the supervision of registered representatives by broker-dealers, and an explanation of his "professional opinion" that "SIFE breached its duty to supervise Tufo with respect to his selling of Medco promissory notes."[14]

SIFE objected to the receipt in evidence of Breen's declaration on the ground that the issue before the court on the motion for summary judgment was simply the question of duty, and that this is a legal not a

[14]Breen states that "SIFE failed to establish and maintain sufficient procedures to ensure that its representatives were not breaching the NASD Rules," failed to properly educate its representatives, including Tufo, "regarding prohibited sales practices," "failed to maintain regular and frequent professional contact with Tufo," "did not implement appropriate supervisory practices, such as records inspection and compliance audits at Tufo's place of employment to ensure his day-to-day operations complied with the NASD's appropriate rules," and "did not conduct periodic visits to Tufo's office." In addition, Breen stated that "[f]rom my review of [the] deposition testimony of [SIFE's chief executive office, Bruce Woods, and his assistant, King], it is my opinion that neither of these persons has sufficient knowledge of the NASD rules to properly supervise Tufo." Finally, Breen stated that "Tufo's indications on the 1996 Compliance Meeting Agenda that he was selling promissory notes, his statements to SIFE's management that he was selling Medco and Tufo's request that SIFE management employee, Melinda Adams, assist him with advertising Medco were some, but not all, of the 'Red Flags' which should have alerted SIFE's management of potential wrongdoing by Tufo."

factual question, and experts may not give opinions on matters essentially within the province of the courts to decide. The trial court sustained this objection, stating that "Mr. Breen offers an opinion as to SIFE's duties, but the existence of a duty is a question of law for the court to determine by reference to the facts." The trial court's ruling was unquestionably correct. It is well established that "the question of the existence and scope of a defendant's duty is a legal question which depends on the nature of the . . . activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696], citing also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 748, pp. 83-86, and cases there cited.) It is equally well established " 'that experts may not give opinions on matters which are essentially within the province of the court to decide.' " (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884 [254 Cal.Rptr. 336, 765 P.2d 498], quoting *Carter v. City of Los Angeles* (1945) 67 Cal.App.2d 524, 525 [154 P.2d 907].)

Appellants claim the trial court erred and that Breen's declaration was properly admissible "to aid the court in deciding whether SIFE breached the standard of care applicable to securities dealers." The sole case they rely upon, *Jambazian v. Borden* (1994) 25 Cal.App.4th 836 [30 Cal.Rptr.2d 768], does not support their argument. *Jambazian* was a medical malpractice action for injuries sustained as a result of surgery and for failure to inform the plaintiff of the consequences of the procedure. The trial court granted summary judgment for the defendant doctor, indicating it relied on the declarations filed by the defendant and two other physicians, and because the plaintiff had failed to present a counterdeclaration from an expert. The court of appeal affirmed, and in the course of its opinion quoted the following statement of the Supreme Court: " '[T]here may be a limited number of occasions in the trial of informed consent claims where the adequacy of disclosure in a given case may turn on the standard of practice within the relevant medical community. In such instances, expert testimony will usually be appropriate.' " (*Id.* at p. 847, quoting *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1190 [23 Cal.Rptr.2d 131, 858 P.2d 598].)

This observation has no bearing on the issue before us. The question in *Jambazian* was not, as it is in this case, the existence of a duty—as physicians unquestionably have the duty to obtain informed consent from their patients—but simply whether the disclosure provided the defendant to the plaintiff was adequate to satisfy that duty, that is to say, whether the disclosure met the appropriate standard of care, which is a factual not a legal question.

## Disposition

For the foregoing reasons, the judgment entered on the grant of summary judgment for SIFE is affirmed. Costs to respondent.

Lambden, J., and Ruvolo, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 14, 2001.