Filed 2/26/16  Weyand v. Union Central Life Ins. Co. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GARRET WEYAND, | |
| Plaintiff and Appellant, | G051071 |
| v. | (Super. Ct. No. 30-2013-00633423) |
| UNION CENTRAL LIFE INSURANCE COMPANY, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Affirmed in part and reversed in part.

Engstrom, Lipscomb & Lack, Walter J. Lack and Steven C. Shuman for Plaintiff and Appellant.

Reed Smith, Margaret M. Grignon, Robert D. Phillips, Jr., Paula M. Mitchell, Kathy J. Huang and Cristyn N. Chadwick for Defendant and Respondent.

\*          \*          \*

Plaintiff and appellant Garret Weyand purchased $10 million in life insurance policies from an authorized agent of defendant and respondent Union Central Life Insurance Company (Union Central). The agent induced Weyand to purchase the insurance by representing the policies were a "'no-risk investment opportunity'" because Weyand would nearly double the amount he spent on premiums if he held the policies for two years and then sold them to investors on the secondary market. The agent, however, failed to disclose recent revisions to life expectancy tables that made the policies less valuable than the agent had claimed, and the agent also failed to disclose other risk factors that could affect the policies' value and Weyand's ability to resell them.

Weyand held the policies for two years as the agent had instructed, but the agent was unable to resell the policies because their value had declined based on the revised life expectancy tables and the entire secondary market for life insurance policies had contracted due to the severe recession in 2008. Weyand allowed the policies to lapse when he could no longer afford the premiums and then brought this action against Union Central and its agent to recover not only the paid premiums, but also the profits the agent represented Weyand would earn when he sold the policies.

Union Central moved for summary judgment, or alternatively summary adjudication, arguing it could not be vicariously liable for the agent's fraud and other misconduct because the agent acted outside the scope of his authority by violating Union Central's express prohibition on its agents selling life insurance policies to an insured who intended to resell the policies on the secondary market. Union Central also argued it could not be directly liable for Weyand's losses because it did not breach any duty by selling the policies to Weyand, and it was not negligent in supervising the agent because it had performed a thorough background check and uncovered no indication the agent was unfit. The trial court agreed and granted Union Central's motion.

We affirm on Weyand's negligent supervision claim, but reverse on all other claims because Union Central failed to meet its initial burden to show it could not

2

be vicariously liable for the agent's conduct as a matter of law. An agent's acts and representations within the ordinary scope of the insurance business are binding on the insurer even if the agent violates the insurer's instructions or limitations on the agent's authority unless the injured insured had actual or constructive notice of the limits on the agent's authority. Union Central failed to present any evidence showing that the agent selling the policies to Weyand acted outside the ordinary scope of the insurance business Union Central entrusted to the agent, or that Weyand had notice of the limitations Union Central had placed on the agent.

Weyand alleged vicarious liability as a liability theory on all causes of action except his negligent supervision claim, and therefore we must reverse the judgment on the vicarious liability claims. We affirm the judgment on the negligent supervision claim because Weyand failed to address it in either his opening or reply brief.

I

FACTS AND PROCEDURAL HISTORY

Union Central is a life insurance company that sells its products in all 50 states through independent insurance agents. In January 2007, Kevin Yurkus applied for an appointment as a Union Central agent. Union Central approved Yurkus's application and appointed him and his company, Fairway Capital, as an agent after completing a background check to confirm Yurkus was licensed to sell life insurance in California, Arizona, and New York, he had been appointed as an agent for nearly 40 other companies, he had no criminal record, and he had not been disciplined in any state or terminated by any company.

To confirm the terms of his appointment, Yurkus signed several agreements acknowledging he agreed to follow Union Central's rules and guidelines for selling and marketing its insurance policies. Union Central's rules and guidelines prohibited all of its agents from selling "a life insurance policy that was purchased with the intent to assign or

3

sell it to an investor, group of investors, or life settlement company" because these transactions potentially violate state laws regarding insurable interests and jeopardize life insurance's tax-favored status by serving as an investment rather than true insurance. The agreements advised Yurkus that selling Union Central policies to an insured for resale on the secondary market was outside the scope of his contract and Union Central would sever its relationship with him.

In late 2007 or early 2008, Weyand was looking for new investment strategies. He was in his early 70's, had owned and operated several successful businesses, and "had done very well in [his] investments." According to Weyand, his son had "heard of Yurkus from an acquaintance and suggest[ed] [Weyand] meet with him about what Yurkus was touting as a 'no-risk investment opportunity' for seniors." At the time, Weyand already had more than $7 million in life insurance and had no specific need for additional insurance.

Weyand met with Yurkus, who presented life settlements as a lucrative investment opportunity for senior citizens. Yurkus explained a life settlement involved a policyholder selling a life insurance policy to an investor for more than the policy's cash surrender value but less than the policy's death benefit with the investor assuming responsibility for paying the policy's premiums until the insured's death. Yurkus represented that he specialized in life settlements and had extensive experience selling life insurance policies to senior citizens who successfully sold those policies for significant profits. At this meeting, Yurkus did not present any financial or investment strategy other than life settlements, nor did he discuss traditional forms of life insurance.

At a follow-up meeting, Yurkus presented Weyand with various scenarios showing how much money he could make if he bought the policies Yurkus recommended and later sold them. To maximize the policies' value, Yurkus explained Weyand would need to hold the policies and pay the premiums for at least two years before he sold them because life insurance policies include an incontestability clause, which prevents the

4

insurer from contesting coverage based on any purported misrepresentation or concealment in the application after the policy's first two years. In his scenarios, Yurkus represented that Weyand could nearly double his money because every $5 million in coverage he purchased could be sold in two years for almost $900,000, but the policy premiums during that period would only be about $479,000. Yurkus recommended Weyand buy a total of $10 million in coverage split between one $5 million policy and five $1 million policies because the smaller policies would be easier to sell. At no point did Yurkus advise Weyand of any economic factors that could affect the value of his policies on the secondary life insurance market or of any risk that he may not be able to sell his policies.

Weyand decided to follow Yurkus's advice and he applied to purchase $10 million in life insurance from Union Central. To support the application, Yurkus wrote a letter to Union Central explaining that Weyand wanted to replace his income for his family when he died and to ensure his wife would continue to enjoy her current lifestyle. The letter also represented "the value of the Weyand estate is currently $17 million and appreciating rapidly." The application process required Weyand and Yurkus to submit a "Statement of Policyowner and Agent Intent" (Statement of Intent), which inquired whether Weyand "presently intend[ed] to assign or sell the life insurance for which [he was] applying" and whether he had "spoken with an individual or company offering to pay [him] for [his] life insurance policy." A Union Central representative also asked him the same questions during a phone interview. In both instances, he answered the questions in the negative.

In July 2008, Union Central issued Weyand a $5 million life insurance policy with an annual premium of $234,250. Union Central also later issued Weyand five $1 million policies that each had a $46,850 annual premium. Between the time Weyand purchased the $5 million policy and the time he purchased the five $1 million policies, the life expectancy tables on which the secondary life insurance market relied

5

were adjusted upward to reflect longer life expectancies. This revision decreased the value of Weyand's policies on the secondary market because it meant he was expected to live longer, which likely would require potential purchasers to pay more premiums and wait longer before collecting on the policies. Yurkus, however, failed to disclose this information before Weyand purchased the five $1 million policies.

When the two-year incontestability period on Weyand's policies expired in August 2010, Weyand contacted Yurkus the next day to ask about selling the policies. Yurkus told Weyand to continue paying the premiums because it would take four or five months to shop the policies and determine their current value on the secondary market. At that time, however, the secondary market for life insurance policies was severely depressed because of the 2008 recession. And contrary to Yurkus's earlier representations, the value of Weyand's policies also had substantially declined because of the upward revision to the life expectancy tables.

Unable to sell the policies, Yurkus stopped returning Weyand's phone calls and disappeared. Weyand continued paying the policy premiums, but eventually they became too expensive because Weyand's investments significantly declined in the recession. In January 2011, Weyand allowed the $5 million policy to lapse, and five months later he allowed all of the $1 million policies to lapse.

In February 2013, Weyand filed this action against Yurkus, Fairway Capital, and Union Central, claiming he would not have bought the life insurance policies if Yurkus had disclosed the revisions to the life expectancy tables and the impact they had on the policies' value, or if Yurkus had disclosed the possibility other economic factors could reduce the policies' value or prevent Weyand from selling them. The complaint asserts claims for breach of fiduciary duty, fraud, negligent misrepresentation, negligence, negligent supervision, and unjust enrichment.[1] Weyand alleged Union

_____

[1] The complaint also alleges a claim for breach of oral contract, but that claim is asserted against Fairway Capital only and is not at issue on this appeal.

6

Central was vicariously liable for Yurkus's conduct because he acted as Union Central's agent in selling Weyand the policies. Weyand also alleged Union Central was negligent not only in failing to supervise Yurkus, but also in failing to recognize Weyand likely purchased the policies for resale based on Union Central's underwriting guidelines and the manner in which Yurkus structured the policies. Weyand claims damages of nearly $1.8 million, which represents not only the amount Weyand paid in premiums before the policies lapsed but also the profit Yurkus represented Weyand would make by selling the policies.

Union Central moved for summary judgment, or alternatively summary adjudication, claiming Weyand conspired with Yurkus to conceal from Union Central their scheme to purchase life insurance policies as investments in violation of Union Central's rules and then sell them to investors on the secondary market after the two-year incontestability period elapsed. The trial court granted the motion, finding (1) Union Central could not be vicariously liable on Weyand's breach of fiduciary duty, fraud, and negligent misrepresentation claims because Yurkus exceeded the scope of his authority by selling life insurance policies for resale on the secondary market in violation of Union Central's rules; (2) Weyand's negligence claim failed because Union Central did not breach any duty by issuing the policies to Weyand; (3) Weyand's negligent supervision claim failed because Union Central had no knowledge Yurkus was unfit to sell life insurance; and (4) Weyand's unjust enrichment claim failed because Union Central provided him with the life insurance coverage during the period he paid the premiums.[2]

After the trial court entered judgment against Weyand, he timely appealed.

---

[2] Yurkus is not a party to this appeal because he never responded to the complaint and Weyand entered his default.

7

## II

### DISCUSSION

A.     *Governing Summary Judgment Principles*

"A defendant moving for summary judgment bears the initial burden to show the plaintiff's action has no merit. [Citation.] The defendant can meet that burden by either showing the plaintiff cannot establish one or more elements of his or her cause of action or there is a complete defense to the claim. [Citations.] To meet this burden, the defendant must present evidence sufficient to show he or she is entitled to judgment as a matter of law. [Citation.] '"If a plaintiff pleads several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them."'" (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 889 (*Carlsen*).)

"Once the defendant meets that burden, the burden shifts to the plaintiff to present evidence establishing a triable issue exists on one or more material facts." (*Carlsen*, *supra*, 227 Cal.App.4th at p. 889.) The plaintiff opposing the motion, however, has no burden to present any evidence until the defendant meets his or her initial burden. (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940 (*Hawkins*) ['"Where the evidence presented by defendant does not support judgment in his favor, the motion must be denied without looking at the opposing evidence, if any, submitted by plaintiff"'].)

"Because a motion for summary judgment raises only questions of law, we independently review the parties' supporting and opposing papers and apply the same standard as the trial court to determine whether a triable issue of material fact exists." (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 967.)

B.     *Union Central Failed to Meet Its Initial Burden of Establishing It Could Not be Vicariously Liable for Yurkus's Conduct as a Matter of Law*

Although Union Central acknowledges appointing Yurkus as its agent, it nonetheless contends it cannot be vicariously liable for his conduct as a matter of law

8

because Yurkus exceeded the scope of his authority. According to Union Central, it prohibits its agents from selling life insurance policies to insureds who intend to resell the policies on the secondary market, and therefore Yurkus acted outside the scope of his authority when he sold policies for resale and failed to disclose the associated risks to the insured. We disagree.

"'[T]he general rule is that ". . . in the absence of notice, actual or constructive, to the insured of any limitations upon such agent's authority, a general agent may bind the company by any acts, agreements or representations that are within the ordinary scope and limits of the insurance business entrusted to him, although they are in violation of private instructions or restrictions upon his authority."'" (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 426 (*Chicago Title*); *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 344 (*R & B Auto Center*); see *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 874.)

In *Chicago Title*, for example, an insurer claimed an insurance binder its agent issued to an insured as evidence of insurance was not enforceable because the agent acted outside the scope of its express authority by issuing the binder without obtaining written authorization as required by the insurer's guidelines and its agreement with the agent. The Court of Appeal rejected this argument and upheld the trial court's judgment enforcing the binder because issuing binders fell within the ordinary scope of the insurance business the insurer entrusted to the agent and there was no evidence the insured was informed of the alleged limitations on the agent's authority. (*Chicago Title*, *supra*, 188 Cal.App.4th at pp. 425-426.)

Here, Union Central presented evidence to show (1) its written rules and guidelines prohibited its agents from selling any life insurance policy to an insured who intended to resell the policy on the secondary market; (2) any agent who sold a policy for resale purposes would act outside of the agent's contract and would be subject to

9

termination; and (3) Yurkus received and agreed to follow Union Central's written rules and guidelines. Union Central also pointed to the allegations of Weyand's complaint and his deposition testimony to show Weyand bought the Union Central policies to resell them at a profit on the secondary market.

Although this evidence may show Yurkus exceeded his authority as a Union Central agent, it does not meet Union Central's initial summary adjudication burden. The evidence fails to show Yurkus's conduct in selling the policies to an insured who intended to later sell them on the secondary market was outside the ordinary scope of the insurance business Union Central entrusted to Yurkus. (See *Chicago Title*, *supra*, 188 Cal.App.4th at p. 426; *R & B Auto Center*, *supra*, 140 Cal.App.4th at p. 344.) It is undisputed Union Central appointed Yurkus as its agent and granted him the authority to sell its life insurance policies. The ordinary scope of the insurance business entrusted to Yurkus included not only selling the policies, but also describing the policies and making representations to potential purchasers about the policies' coverage, costs, and other characteristics. Whether an insured could sell a policy on the secondary market is a characteristic of the policy an insurer reasonably could expect an agent to discuss with a potential purchaser—especially a high net worth purchaser—as demonstrated by Union Central's rules and guidelines describing when its policies could and could not be sold.

The evidence also fails to show Weyand had notice of the limitations Union Central placed on Yurkus's authority to sell its life insurance policies. (See *Chicago Title*, *supra*, 188 Cal.App.4th at p. 426; *R & B Auto Center*, *supra*, 140 Cal.App.4th at p. 344.) Nothing in the applications Weyand completed or any of the other information he received from Yurkus or Union Central informed him Union Central prohibited Yurkus from selling any Union Central life insurance policy to an insured who intended to resell the policy on the secondary market. The Statement of Intent Weyand completed to obtain the policies asked whether he had the present intent to sell the policies and if he had spoken to anyone who offered to buy his policies. Although these questions raised

10

the issue of resale, they did not inform Weyand that Union Central prohibited its agents from selling policies for resale purposes or, more importantly, that Yurkus would be acting outside the scope of his authority if he sold policies to Weyand for resale purposes. We therefore conclude the trial court erred in granting Union Central summary adjudication on Weyand's breach of fiduciary duty, fraud, and negligent misrepresentation claims because Union Central failed to show it could not be liable for Yurkus's conduct as a matter of law.[3]

Union Central relies on *Asplund v. Selected Investments in Financial Equities, Inc.* (2000) 86 Cal.App.4th 26 (*Asplund*), arguing it held "that when an agent commits acts that are expressly prohibited under his agency agreement with his principal, those acts are outside the scope of his authority as a matter of law and vicarious liability will not be imposed on the principal under the doctrine of respondeat superior." (Italics omitted.)  Union Central overstates *Asplund*'s holding and that case is readily distinguishable on its facts.

In *Asplund*, a husband and wife sued a securities broker-dealer for losses they suffered when promissory notes they purchased from the broker-dealer's registered representative turned out to be a Ponzi scheme.  The broker-dealer moved for summary judgment, arguing it was not vicariously liable because selling the notes was outside the scope of the representative's agency relationship with the broker-dealer.  (*Asplund*, *supra*, 86 Cal.App.4th at pp. 29-30.)

---

[3]    Because we conclude Union Central failed to meet its initial summary adjudication burden, we do not address Weyand's contentions that he established triable issues concerning (1) whether he purchased the policies with the present intent to resell them or simply with the intent to have resale as an option if he later chose to sell the policies; (2) whether Union Central prohibited agents from selling policies to insureds who wanted the option to resell them but had no plans to resell at the time of purchase; and (3) whether Union Central communicated all of its rules and guidelines about resale to Yurkus.

11

In support, the broker dealer presented evidence showing its "only purpose [was] to act as a management company for a mutual fund" the representative sold on its behalf and the promissory notes the couple purchased had no connection to that mutual fund. (*Asplund*, *supra*, 86 Cal.App.4th at pp. 29, 32.) The broker-dealer also presented an agreement that appointed the representative as the broker-dealer's agent for the sale and distribution of the mutual fund only, prohibited the representative from selling competing financial products, allowed the representative to sell other products and services that did not compete with the broker-dealer's mutual fund, and declared the representative was an independent contractor rather than an employee of the broker-dealer. (*Id*. at pp. 32-33.) The evidence also showed the representative was an insurance agent for Farmers Insurance Group, he sold the promissory notes out of his insurance office, the broker-dealer did not receive any of the proceeds from the sale of the promissory notes, and the representative never said the notes were one of the broker-dealer's products or affiliated with the broker-dealer. (*Id*. at pp. 29, 30, 48.)

The trial court granted the broker-dealer summary judgment because there was no evidence the representative acted as the broker-dealer's agent when he sold the husband and wife the promissory notes. (*Asplund*, *supra*, 86 Cal.App.4th at p. 45.) The *Asplund* court affirmed, explaining "the limitations set forth in the sales representatives agreement, coupled with the absence of substantial evidence of apparent or actual authority beyond that specified in the agreement, eliminates any basis upon which to impose vicarious liability on [the broker-dealer] under the doctrine of respondeat superior." (*Id*. at p. 49.)

*Asplund* stands for the simple proposition that a principal cannot be vicariously liable for its agent selling another company's financial product when there is no evidence showing the agent had authority to sell that product on the principal's behalf, the agent represented he had such authority, or the product had any connection to the principal. Here, unlike in *Asplund*, it is undisputed Yurkus was Union Central's agent

12

with authority to sell its life insurance policies, Yurkus represented he was selling Union Central policies, Weyand completed a Union Central application to obtain the policies, Union Central interviewed Weyand before he purchased the policies, Union Central issued the policies to Weyand, and Weyand paid the premiums to Union Central. This substantial evidence connects Union Central to the policies Weyand purchased from Yurkus and therefore renders *Asplund* inapposite.

Union Central also contends it is not liable for Yurkus's conduct because California law holds an insurer liable only for its agent's misrepresentations about the coverage the insurer provides, and Yurkus's misrepresentations about Weyand's ability to resell his Union Central policies on the secondary market had nothing to do with coverage. (See, e.g., *Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1099-1101 (*Paper Savers*); *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1119-1121 (*Desai*); *Free v. Republic Ins. Co.* (1992) 8 Cal.App.4th 1726, 1729-1730 (*Free*); *Jackson v. Aetna Life & Casualty Co.* (1979) 93 Cal.App.3d 838, 840, 847 (*Jackson*).) Union Central reads these cases too narrowly.

In each case, the court held an insurer could be liable for its agent's misrepresentations about the type or extent of coverage the insurer's policy provided. For example, in *Paper Savers*, the Court of Appeal reversed a summary judgment in the insurer's favor, explaining the insurer could be liable for its agent selling the plaintiff insured a policy that did not provide 100 percent cost of replacement coverage when the agent represented the policy would cover the entire cost to replace any damaged machinery, even if the cost exceeded the policy limits. (*Paper Savers*, *supra*, 51 Cal.App.4th at pp. 1092-1093, 1101; see *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1446, 1464-1465 [insurer potentially liable on negligent misrepresentation, negligence, and other claims for agent telling insured policy provided coverage it did not include].) Nothing in *Paper Savers* or any of the other cited cases,

13

however, limits an insurer's liability for its agent's representations only to the type or extent of coverage.

Rather, liability in each of the foregoing cases turns on whether the agent misrepresented the characteristics of the insurer's policy to induce the insured to purchase the policy the insurer authorized the agent to sell. (See *Paper Savers*, *supra*, 51 Cal.App.4th at p. 1101 ["this case involves a special duty to ensure such coverage based on alleged affirmative assertions made to induce the insured to purchase the policy and additional endorsement"]; *Desai*, *supra*, 47 Cal.App.4th at pp. 1118-1120; *Free*, *supra*, 8 Cal.App.4th at pp. 1729-1730; *Jackson*, *supra*, 93 Cal.App.3d at p. 847.) It is irrelevant whether the misrepresentations related to the type or extent of coverage, the amount of the premiums, the insured's ability to resell the policy, or any other characteristic of the policy that bore on the insured's decision to purchase it. The insurer is liable for the agent's representations if the representations are made within the ordinary scope of the insurance business the insurer entrusted to the agent, and the insured had no notice of any limits the insurer placed on the agent's authority. (*Chicago Title*, *supra*, 188 Cal.App.4th at p. 426; *R & B Auto Center*, *supra*, 140 Cal.App.4th at p. 344.)

We emphasize Union Central sought summary adjudication based solely on its challenge it was not vicariously liable for Yurkus's conduct because his alleged conduct exceeded the scope of his authority. Union Central did not challenge whether Weyand could establish any of his underlying causes of action based on Yurkus's conduct and we therefore do not address that question. Moreover, although Union Central made several comments suggesting Weyand improperly seeks to recover the profits Yurkus represented Weyand would receive when he sold the policies in addition to the premiums, the proper measure of damages was not the issue on which Union Central sought summary adjudication. Nor is it an issue we properly may decide on appeal. (See Code Civ. Proc., § 437c, subd. (f)(1) ["A motion for summary adjudication

14

shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for [punitive] damages, or an issue of duty"].)

C.     *Union Central Failed to Negate All Theories Weyand Alleged to Support His Negligence Claim*

Union Central contends Weyand's negligence claim fails as a matter of law because negligence is not a permissible theory of recovery for an insured against his or her insurer.  Based on the contractual nature of the relationship between an insured and an insurer, Union Central claims an insured cannot sue its insurer for negligence or other torts absent allegations of bad faith, and Weyand does not allege Union Central acted in bad faith.  We do not decide this issue, but nonetheless reverse the trial court's judgment granting summary adjudication on Weyand's negligence claim because Union Central failed to negate all liability theories Weyand alleged to support this claim.[4]

Weyand's complaint alleges two separate liability theories to support his negligence claim.  First, Weyand alleges Union Central is vicariously liable for Yurkus's negligence in recommending Weyand purchase the policies without disclosing all associated risks.  Second, Weyand alleges Union Central was negligent in selling the policies to Weyand when its own underwriting guidelines and other circumstances surrounding the transaction suggested Weyand was purchasing the policies to resell them and he would not be able to continue paying the premiums on his own.

---

[4]     We also do not decide whether the trial court erred in sustaining Union Central's evidentiary objections to the declarations of Steve Roth, Chris Matheson, and Peter Mazonas and certain exhibits attached thereto.  Weyand fails to specify the issues on which he submitted these declarations and exhibits, but it appears he offered them to show Union Central acted negligently in failing to warn of its rules against selling policies for resale purposes and in failing to recognize that Weyand was purchasing the policies for resale based on its underwriting guidelines and other surrounding circumstances.  Because we do not decide the merits of Union Central's challenge to Weyand's negligence claim, we need not decide Weyand's challenge to the evidentiary objections that relate to that claim.

To meets its initial summary adjudication burden on its challenge to Weyand's negligence claim, Union Central was required to present evidence showing it was entitled to judgment based on all of Weyand's liability theories. (*Carlsen*, *supra*, 227 Cal.App.4th at p. 889; *Tesselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 162-163 (*Tesselle*).) If it failed to establish its entitlement to judgment on all of Weyand's alleged liability theories, the trial court must deny Union Central's summary adjudication motion on the entire negligence claim because summary adjudication must completely dispose of a cause of action, affirmative defense, punitive damages claim, or issue of duty.[5] (Code Civ. Proc., § 437c, subd. (f)(1).)

As explained above, Union Central failed to meet its initial burden to show it could not be vicariously liable for Yurkus's conduct, which would include Yurkus's negligence. Regardless of whether Union Central established it was not negligent, Union Central failed to establish it could not be vicariously liable for Yurkus's negligence, and therefore is not entitled to summary adjudication.

D.  *Weyand Forfeited All Challenges to the Trial Court Summarily Adjudicating His Negligent Supervision Claim*

Weyand's complaint asserts a negligent supervision claim against Union Central, alleging it "negligently . . . supervised and oversaw the activities . . . Yurkus and Fairway Capital performed in the course of marketing and selling Union Central life insurance policies." The trial court granted summary adjudication on this claim because Union Central presented evidence showing it conducted a thorough background check

---

[5]  We do not address whether Union Central's liability for its own negligence is an issue of duty that may be summarily adjudicated under Code of Civil Procedure section 437c, subdivision (f)(1), because Union Central only sought summary adjudication on the entire negligence cause of action. It did not separately seek summary adjudication on whether it owed Weyand a duty. (See *Hawkins*, *supra*, 144 Cal.App.4th at p. 949 [summary adjudication may not be granted on issue moving party did not raise].)

16

and investigation of Yurkus and had no notice he was unfit to serve as a life insurance agent, and Weyand failed to present any evidence to create a triable issue of fact. Weyand forfeited any challenge to the court's ruling by failing to address it in either his opening or reply briefs.

"On appeal, a judgment of the trial court is presumed to be correct. . . . [¶] 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."' [Citation.] 'We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.'" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956; see *People v. Stanley* (1995) 10 Cal.4th 764, 793.) This rule applies even when the de novo standard is the governing standard of review. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [appellate court refused to address propriety of summary adjudication on causes of action appellant failed to challenge in opening brief].)

E.   *Union Central Failed to Establish Weyand's Unjust Enrichment Claim Failed as a Matter of Law*

Union Central contends Weyand's unjust enrichment claim fails as a matter of law because Union Central provided him exactly what it promised – $10 million in life insurance coverage as long as he paid the premiums – and therefore Union Central was not unjustly enriched by the premiums Weyand paid. We conclude Union Central failed to meet its initial burden on its challenge to this claim because it failed to address Weyand's liability theory.

California courts are split on whether a separate cause of action for unjust enrichment exists. (*Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1138 (*Levine*).) Some have recognized a separate cause of action (see, e.g., *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1593), while others have concluded

17

"""[t]here is no cause of action in California for unjust enrichment""" (see, e.g., *Levine*, at p. 1138). But all acknowledge that unjust enrichment is synonymous with restitution. (*Ibid*.; *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 (*Durell*).)

"'Under the law of restitution, "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.]" [Citation.] However, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it."'" (*Durell*, *supra*, 183 Cal.App.4th at p. 1370, italics omitted; see *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 171, fn. 23 (*California Medical*).)

"As a matter of law, an unjust enrichment claim does not lie where the parties have an *enforceable* express contract." (*Durell*, *supra*, 183 Cal.App.4th at p. 1370, italics added; see *California Medical*, *supra*, 94 Cal.App.4th at p. 172.) Moreover, "''[t]here is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected."'" (*Durell*, at p. 1371.)

Contrary to Union Central's contention, Weyand claims he did not have an enforceable express contract with Union Central and he did not receive the exchange he expected. Weyand's complaint alleges the premiums he paid on the policies unjustly enriched Union Central because he did not receive policies that could be resold as Yurkus had represented. According to Weyand, Yurkus fraudulently induced him into purchasing the policies by misrepresenting the ability to resell the policies at a profit after two years, and he would not have purchased the policies if he knew he could not resell them.

Union Central's challenge to this claim assumes it cannot be held vicariously liable for Yurkus's fraud. It focuses solely on the terms of the policies it

18

issued to Weyand to show he received the policies he expected. As explained above, however, Union Central failed to establish it could not be held vicariously liable for Yurkus's fraud and other misconduct. Consequently, Union Central's challenge to this cause of action fails because it does not address Weyand's allegations Union Central was unjustly enriched by Yurkus fraudulently inducing Weyand to purchase policies he could not resell and that he otherwise would not have purchased. (See *Carlsen*, *supra*, 227 Cal.App.4th at p. 889; *Tesselle*, *supra*, 173 Cal.App.4th at pp. 162-163.)

## III

### DISPOSITION

The judgment is affirmed as to the negligent supervision cause of action and reversed as to all other causes of action. Weyand shall recover his costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.

19