14 F.3d 1338
 62 USLW 2516, Fed. Sec. L. Rep. P 98,024
 Willis V. HAUSER, Rafael Acosta, Plaintiffs-Appellants,
v.
John FARRELL, Alvin Harvey, Rauscher, Pierce, Refsnes, Inc.,
a California Corporation, Janice Industries, Inc.,
d/b/a Janmar Lighting, a California
Corporation, Truman Aubrey,
Defendants-Appellees.
 No. 91-16400.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 16, 1992.
Decided Jan. 14, 1994.
 
 Richard McKnight, Las Vegas, NV, for plaintiffs-appellants.
 Rodney M. Jean, Evan J. Wallach, Lionel Sawyer & Collins, Las Vegas, NV, for defendant-appellee Rauscher, Pierce, Refsnes, Inc.
 Appeal from the United States District Court for the District of Nevada.
 Before: NORRIS, BEEZER and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 Appellants Hauser and Acosta invested in a business venture with two stockbrokers at Rauscher, Pierce, a securities brokerage firm. The venture failed. The appellants sued the stockbrokers and the firm, and obtained a judgment against the stockbrokers based on fraud. The appellants proposed several theories of vicarious liability to hold the brokerage firm liable, but the district court granted summary judgment in favor of the firm on the ground that the business venture was outside Rauscher, Pierce's control. We affirm.
 
 
 2
 I. Facts.
 
 
 3
 The undisputed facts establish the following. The stockbrokers, John Farrell and Alvin Harvey, worked for Rauscher, Pierce between October 1986 and November 1987. They sold the appellants interests in a partnership, intended to be incorporated, called New Technologies in Energy (NTE), which was promoted as a provider of energy efficient lighting to hotels and casinos. Some of the conversations in which the stockbrokers promoted the business to the customers, and the exchange of the customers' money for the agreements to sell them interests in NTE, took place at Rauscher, Pierce. NTE was not a Rauscher, Pierce promotion. The two stockbrokers owned it themselves. No one at the firm except the two stockbrokers themselves knew the brokers were selling interests in NTE. Although their supervisor reviewed their orders daily, the NTE investment did not pass through that process. The broker who sold the NTE investment to Mr. Hauser, John Harvey, testified at his deposition that he considered it a private transaction having nothing to do with Rauscher, Pierce and he did not report it to Rauscher, Pierce.
 
 
 4
 The stockbrokers testified at their depositions that they told Mr. Hauser and Mr. Acosta several times that the NTE investment had nothing to do with Rauscher, Pierce, and Rauscher, Pierce had nothing to do with the transactions. The NTE transactions were not listed on the statements Mr. Hauser and Mr. Acosta received from Rauscher, Pierce or the previous firms the stockbrokers had worked for when they previously sold the appellants NTE interests.
 
 
 5
 Both customers were sophisticated, experienced investors. Mr. Hauser first learned of NTE in 1984, and began investing money in it in February 1986, some months before the stockbrokers went to work for Rauscher, Pierce. After the brokers began working for Rauscher, Pierce, they continued to promote NTE to Mr. Hauser, and he invested more money in October 1987. For a while, Mr. Hauser would meet one or both of the stockbrokers at the Rauscher, Pierce office about twice a week, and they would go to lunch together. The October 1987 sale was concluded at the Rauscher, Pierce office, with the two stockbrokers and a secretary present. Mr. Hauser acknowledged at his deposition that when he first invested in NTE, he understood that it was a side deal unconnected with his trading activities through the brokerage firm for which they then worked. He never received anything on Rauscher, Pierce stationery encouraging him to invest in NTE. He did not recall any discussion of whether Rauscher, Pierce had any interest in NTE, but he "presumed" the firm was involved.
 
 
 6
 Mr. Acosta testified at his deposition that he too became acquainted with the two stockbrokers before they went to work for Rauscher, Pierce, although he did not invest in NTE until the summer of 1987, when the stockbrokers were working for the firm. He, like Mr. Hauser, understood from the stockbrokers that they were planning to quit working for Rauscher, Pierce and go to work full-time in the lighting company they were creating, NTE. His conversations with the brokers about NTE took place at their Rauscher, Pierce office. Although the stockbrokers' supervisor walked into the office at least once while they were discussing NTE, Mr. Acosta did not recall what they said that the supervisor might have overheard, and did not know if Rauscher, Pierce received a commission or owned any interest in NTE. He assumed that the supervisor knew the brokers were promoting NTE.
 
 
 7
 The complaint alleged that Harvey and Farrell had violated Rule 10b-5 by misrepresenting certain facts in connection with the NTE investment. Rauscher, Pierce was alleged to be liable as an "aider and abettor" of the Rule 10b-5 violation, as a "controlling person" within 15 U.S.C. Sec. 78t(a), and under the theory of respondeat superior. The district court granted Rauscher, Pierce's motion for summary judgment on all of these claims. The court also denied appellants' motion for sanctions against Rauscher, Pierce on the basis of their motion to disqualify appellants' counsel, and affirmed the magistrate's order granting Rauscher, Pierce's request for attorney's fees incurred in bringing a motion for a protective order.
 
 
 8
 II. Rule 56(f) Continuance.
 
 
 9
 The customers' attorney moved for a continuance to take the deposition of a Mr. Ruhl under Federal Rule of Civil Procedure 56(f). Plaintiffs' counsel represented that he believed Mr. Ruhl would testify that the stockbrokers' supervisor knew something about the NTE venture. The judge did not abuse his discretion in denying the motion. Plaintiffs offered no reason why they did not depose Mr. Ruhl during the 27 months from the date the lawsuit was filed to the close of discovery.
 
 
 10
 III. Summary Judgment.
 
 
 11
 We review the grant of summary judgment de novo, determining whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Federal Deposit Ins. Corp. v. O'Melveny & Meyers, 969 F.2d 744, 747 (9th Cir.1992).
 
 
 12
 A. Controlling Person.
 
 
 13
 The main issue in this case is whether Rauscher, Pierce is liable as a "controlling person" for purposes of the Securities Exchange Act of 1934. The relevant provision extends vicarious liability of brokerage firms beyond common law respondeat superior liability, subject to certain exceptions:
 
 
 14
 Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 15
 15 U.S.C. Sec. 78t(a). We held in Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1573 (9th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), that as a matter of law, a broker-dealer is a controlling person under that provision with respect to its registered representatives. We reasoned that the securities laws impose on broker-dealers a duty to supervise their registered representatives, and the representatives need the dealers to gain access to the securities markets. We saw no basis for a distinction between employees or other agents and independent contractors. The statute bases liability solely on the control relationship, subject to the good faith defense.
 
 
 16
 We explained in Hollinger that a broker-dealer is not necessarily liable "for all actions taken by its registered representatives," and is not an insurer of its representatives. Id. at 1575. In addition to the good faith defense, we noted the possibility of actions by the stockbroker outside the firm's control:
 
 
 17
 The broker-dealer may also, of course, rely on a contention that the representative was acting outside of the broker-dealer's statutory "control." For example, [the broker-dealer] could argue that when appellants entrusted their money to [the representative] they were not reasonably relying upon him as a registered representative of [the broker-dealer], but were placing the money with [the representative] for purposes other than investment in markets to which [the representative] had access only by reason of his relationship with [the] broker-dealer.
 
 
 18
 Id. at 1575-76, n. 26. We have not previously had occasion to consider what conduct by a representative is "outside of the broker-dealer's statutory control."
 
 
 19
 The district judge carefully analyzed the evidence submitted on the motion for summary judgment, and, finding no genuine issue of fact, held as a matter of law that this was an "outside" transaction for purposes of controlling person liability:
 
 
 20
 However, this litigation does not involve the type of securities transactions that could only be performed through Harvey's and Farrell's association with a broker-dealer. The dispute here centers on an investment promoted as an interest in a small enterprise that was unrelated to any of the securities offered by Rauscher/Pierce through its registered agents. Harvey and Farrell were not acting in their capacity as "registered agents" of Rauscher/Pierce when they approached the plaintiffs with this supposed investment opportunity. Rather, the NTE investment scheme proposed by Harvey and Farrell was their own personal project, in which they held personal interests. On the other hand, Rauscher/Pierce has never had an interest in the venture. There has been no evidence offered to suggest that Rauscher/Pierce even had any meaningful knowledge of the scheme or that it was the type of transaction that Rauscher/Pierce dealt with or had an interest in at all as a brokerage house. In fact, it was not. Rather, the NTE "deal" was a separate arrangement entered into by the co-defendants as private individuals, not as "registered agents" of Rauscher/Pierce. As such, that scheme and any related transactions fall outside the scope of that activity that Rauscher/Pierce, as a broker, is statutorily required to supervise. There is no evidence that Harvey and Farrell used their "access to the trading markets" through Rauscher/Pierce to promote the NTE venture. Nor is there a suggestion that Harvey and Farrell could not have legally promoted this scheme without being registered with the SEC or with a broker-dealer. This was simply not a "securities transaction" of the type contemplated by 15 U.S.C. Sec. 77o.
 
 
 21
 Moreover, there is no evidence to suggest that the plaintiffs relied on Harvey and Farrell's association with Rauscher/Pierce as registered agents of a broker-dealer in their decision to invest in NTE. On the contrary, the deposition of plaintiff Willis Hauser demonstrates that he learned about the NTE venture through his association with the co-defendants in 1984, long before Harvey and Farrell became employed with Rauscher/Pierce. Additionally, plaintiff Rafael Acosta's deposition testimony makes clear that the investment promotion by Harvey and Farrell was completely divorced from their relationship with Rauscher/Pierce. In fact, Acosta's testimony reflects the fact that Harvey and Farrell suggested that they would quit their jobs as registered agents of Rauscher/Pierce if they were able to get the NTE venture off the ground.
 
 
 22
 In Hollinger the court explicitly recognized that the "broker-dealer" rule, imposing vicarious liability on brokerage houses as "controlling persons," could only be applied in instances where the alleged wrong-doer was involved in transactions normally supervised by his/her employer under its 15 U.S.C. Sec. 77o statutory duty. The court held:
 
 
 23
 The broker-dealer may also, of course, rely [as a defense] on a contention that the representative was acting outside of the broker-dealer's statutory "control". For example, [the defendant/broker] could argue that when appellants entrusted their money to [the co-defendant/registered agent], they were not reasonably relying upon him as a registered representative of [the defendant/broker], but were placing the money with [the co-defendant/registered agent] for purposes other than investment [in markets] to which [the co-defendant/registered agent] had access only by reason of his relationship with [the defendant-broker],
 
 
 24
 Hollinger, at 1575 n. 26 (emphasis added). This is just such a case.
 
 
 25
 There has been no evidence offered that substantiates the claim that Harvey and Farrell were acting in anything other than their individual capacity in promoting the NTE venture. There is no evidence which reasonably suggests that the plaintiffs relied on Harvey and Farrell as registered representatives of Rauscher/Pierce in choosing to invest in NTE. Therefore, even viewing the evidence before the court in the light most favorable to the plaintiffs, Rauscher/Pierce does not qualify as a "controlling person" in relation to their employee/codefendants' promotion of NTE.
 
 
 26
 Congress could not have reasonably contemplated imposing "controlling person" liability on brokerage houses for all of the tortious acts of their employees, no matter how unrelated that wrongdoing may be to those persons' employment. Since the statutory duty of control imposed by 15 U.S.C. Sec. 77o must be limited to those transactions which could have reasonably been regulated and controlled by an employer, there can be no liability imposed upon the defendant Rauscher/Pierce in this case under the "controlling person" theory.
 
 
 27
 Our de novo review of the record reveals no error in this analysis. Considering all the circumstances of the transactions, Mr. Hauser and Mr. Acosta were not reasonably relying upon the stockbrokers as registered representatives of Rauscher, Pierce. They were placing the money with the stockbrokers for purposes other than investment in markets to which stockbrokers had access only by reason of their relationship with Rauscher, Pierce. As the district court pointed out, the brokers did not need Rauscher, Pierce to promote NTE, it was not the kind of investment for which a customer typically relies on a broker with access through his firm to a stock exchange, and Hauser bought into NTE before the brokers even went to work for Rauscher, Pierce. Acosta knew that the brokers were planning to quit working for Rauscher, Pierce so that they could devote more of their efforts to NTE. Rauscher, Pierce had no knowledge of or financial interest in the NTE venture. In addition to the evidence expressly alluded to by the district judge, we note that Mr. Hauser's and Mr. Acosta's statements from Rauscher, Pierce did not list the NTE investments. Mr. Hauser and Mr. Acosta did not, in the deposition excerpts provided to the district court, contradict the brokers' representations that they told the customers that the NTE investment would not be through Rauscher, Pierce and had nothing to do with Rauscher, Pierce.
 
 
 28
 B. Aider and Abettor Liability.
 
 
 29
 Appellants argue that Rauscher Pierce is liable as an aider and abettor under 15 U.S.C. Sec. 78j(b). This requires proof of three things under Durham v. Kelly, 810 F.2d 1500, 1505 (9th Cir.1987): (1) existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong. Appellants offered no evidence of wrong, scienter, or assistance in the wrong by anyone other than the stockbrokers themselves at Rauscher, Pierce. They argue that since the stockbrokers were denoted as vice-presidents by their firm, their rank was high enough so that the firm must be held responsible for their knowledge. But aider and abettor liability is a means of holding responsible someone other than the wrongdoer who, knowing of the independent wrong and his or her role in furthering it, substantially assists in the wrong. The concept cannot be applied through a legal fiction to an entity which does not know of the wrong or its role if any in furthering it.
 
 
 30
 C. Respondeat Superior Liability.
 
 
 31
 Appellants also argue that Rauscher, Pierce was vicariously liable under Nevada law doctrine of respondeat superior. The theory appears to be that, since the stockbrokers were Rauscher, Pierce employees, customers would reasonably rely on Rauscher, Pierce. We recognized that such a state law claim is not supplanted by controlling person liability, in Hollinger, 914 F.2d at 1577. Nevertheless, the district court correctly concluded the record left room for no genuine issue of fact, because it established that the customers could not reasonably have believed that Rauscher, Pierce had anything to do with the NTE promotion. Oehler v. Humana, Inc., 105 Nev. 348, 775 P.2d 1271, 1273 (1989); Ellis v. Nelson, 68 Nev. 410, 233 P.2d 1072, 1076 (1951).
 
 
 32
 IV. Sanctions.
 
 
 33
 A. Rule 11.
 
 
 34
 Rauscher, Pierce moved to disqualify the customers' attorney on the ground that he interviewed one of the stockbrokers, at about the same time that the stockbroker was going back to work for Rauscher, Pierce, without notifying Rauscher, Pierce's attorney. The Nevada ethical rule, S.C.R. 182, like Model Rule of Professional Conduct 4.2, prohibited a lawyer from communicating about the subject of representation with a party, or persons whose conduct would be imputed to the party, whom the lawyer knew to be represented, except with consent of the other lawyer or authorization by law. Basically the motion accused the customers' attorney of going behind the back of the brokerage firm's attorney to the stockbroker. The judge denied the motion for disqualification, and also denied plaintiffs' motion for Rule 11 sanctions. Plaintiffs appeal the denial of Rule 11 sanctions. Although the court ultimately had denied the motion to disqualify, the question was close. The judge did not abuse his discretion. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990); Moore v. Local Union 569 of the Int'l Bhd. of Elec. Workers, 989 F.2d 1534, 1537 (9th Cir.1993). The motion was by no means frivolous, legally unreasonable, without legal foundation, or brought for any improper purpose.
 
 
 35
 B. Discovery Sanction.
 
 
 36
 Plaintiffs' counsel on January 24 noticed up the depositions of the stockbrokers' secretary and "the person most knowledgeable of Rauscher Pierce Refsnes, Inc." for February 19 and 20, at plaintiffs' attorneys' office in Las Vegas. Defense counsel asked him to change the dates, because February 19 was a legal holiday, and he had a trial beginning February 20 in a case which he had been handling exclusively for many years. He offered numerous alternative dates. The magistrate not only granted defense counsel's motion for a protective order, but also ordered plaintiffs to pay $1,600 to defendant as the reasonable expenses including attorneys' fees of seeking the protective order, under Federal Rule of Civil Procedure 26(c). We review for clear error, Grimes v. City and County of San Francisco, 951 F.2d 236, 240 (9th Cir.1991), and find none. Obstructive refusal to make reasonable accommodation, such as plaintiff exhibited, not only impairs the civility of our profession and the pleasures of the practice of law, but also needlessly increases litigation expense to clients.
 
 
 37
 AFFIRMED.