COLORADO COURT OF APPEALS                                    **2017COA66**

Court of Appeals No. 16CA0293
City and County of Denver District Court No. 14CV32252
Honorable John M. McMullen, Judge

Susan Houston,

Plaintiff-Appellant,

v.

Southeast Investments N.C., Inc.,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division VII
Opinion by CHIEF JUDGE LOEB
Davidson* and Nieto*, JJ., concur

Announced May 18, 2017

The Law Offices of Michael L. Poindexter, Michael L. Poindexter, Golden,
Colorado, for Plaintiff-Appellant

Snell & Wilmer, LLP, James D. Kilroy, Luke M. Mecklenburg, Denver, Colorado,
for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     In this securities fraud case, plaintiff, Susan Houston, appeals the district court's grant of summary judgment in favor of defendant, Southeast Investments N.C., Inc. (Southeast).  We affirm.

I.     Background

¶ 2     This case arises out of Craig Sorenson's and Frederick Hornick's efforts to allegedly defraud Houston, a retired, unmarried woman, in order to finance and establish 1st Consumer Financial Services, Inc. (CFS), a financial investment company created and owned by Sorenson.  Although the factual background of this case is somewhat complicated, the sole issue on appeal is whether the district court erred in granting summary judgment for Southeast, based on its conclusion that, as a matter of law, Southeast was not liable as a control person under section 11-51-604(5)(b), C.R.S. 2016, of the Colorado Securities Act (the Colorado Act).

¶ 3     The pertinent facts are largely undisputed.  In 2008, through a program at their church, Hornick became a spiritual mentor to Houston.  As part of the program, Hornick would voluntarily visit Houston once a month with another church member to discuss matters of faith and provide spiritual guidance.  Over time,

however, Hornick began to visit Houston significantly more often, and alone. During his solo visits, Hornick would help Houston with house repairs and yardwork and, occasionally, would take her to medical appointments or out to dinner along with his wife. Eventually, Houston and Hornick became close friends.

¶ 4 In late 2010 or early 2011, Sorenson hired Hornick to work for CFS. Around this time, Hornick began to mention his investment advising expertise to Houston and occasionally suggested that Houston let him handle her investments. Houston largely ignored these invitations because she owned two relatively safe and secure annuity contracts that adequately provided for her needs.

¶ 5 At all relevant times, Southeast was an authorized and registered broker-dealer of securities. In February 2013, Sorenson signed an Independent Contractor Agreement and Registered Representative Agreement with Southeast. Under these agreements (and pursuant to federal regulations), Sorenson was prohibited from engaging in outside business activities not involving Southeast (sometimes referred to in the securities industry as "selling away") without disclosing such activities to Southeast and obtaining written approval.

¶ 6      Also, in February of 2013, Houston was involved in a car accident and sustained a neck injury that caused her significant pain.  After the accident, Hornick became increasingly aggressive about assisting Houston with her investments, even going so far as to insinuate that Houston could repay him for all of his help over the prior years by letting him manage her investments.  Eventually, in the spring of 2013, Houston agreed to Hornick's requests and liquidated her entire retirement savings — worth approximately $700,000 — and transferred the money into a self-directed IRA account to be managed by Hornick.[1]

¶ 7      Almost immediately after the funds were placed in the IRA, Hornick transferred all of the money to his own holding company — through a $700,000 loan to himself.  Hornick took out this loan from Houston's IRA even though he had no ability to repay it.  Shortly thereafter, Hornick loaned nearly all of Houston's funds to

_____

[1] It appears from the record that, in 2009, Hornick had been permanently barred from acting as a broker, or associating with broker-dealers, in securities sales as the result of a civil action brought by the Securities and Exchange Commission (the SEC) against him.

two people, Troy West and Sorenson.[2]  These loans were exchanged for promissory notes to Hornick — none of which was adequately secured.  West and Sorenson then invested funds from the loans in CFS (i.e., Sorenson's company).[3]

¶ 8    A few months after she gave Hornick control of her savings, Houston demanded a full return of the money.  To her dismay, however, Houston discovered that the entire $700,000 had been squandered and all of the promissory notes were in default.  Soon thereafter, Houston sued a number of parties under various theories of liability.  As pertinent to this appeal, the only remaining issue concerns her control person liability claim against Southeast, as alleged in her third amended complaint.

---

[2]  As compensation for these loans, Hornick compensated himself with approximately $74,000 of Houston's money.  Hornick took this money and invested it in CFS on his own behalf.

[3]  There were multiple promissory notes issued to Hornick from West and Sorenson.  Of these, however, only one note was actually secured — by a $7000 annuity owned by Troy West's father.  Troy West had pledged to secure another loan with a $100,000 annuity, but that security was never finalized.  Thus, it appears from the record that, for her $700,000, Houston was secured for only approximately $7000.  After the original complaint in this action was filed against Hornick and other parties, Hornick purported to assign the various promissory notes to Houston.

¶ 9    In that complaint, Houston alleged that Southeast was in control of Sorenson with regard to his fraudulent conduct underlying this case and, therefore, was liable as a control person under Colorado law.  After discovery, Southeast moved for summary judgment, arguing that it was not in control of Sorenson in the context of this case because the undisputed evidence demonstrated that it had absolutely no direct or indirect involvement with, or knowledge of, Sorenson's outside investment activities on behalf of CFS and, specifically, regarding Houston.

¶ 10    The district court agreed with Southeast and granted its motion for summary judgment.  First, the court noted that the analytical framework for determining control person liability under section 11-51-604(5)(b) of the Colorado Act was a matter of first impression.  It therefore looked to persuasive federal authorities that had interpreted and applied section 11-51-604(5)(b) and its federal counterpart, section 20(a) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C § 78t(a) (2012).

¶ 11    After its consideration of various authorities, the district court adopted the control person liability analysis set forth in *Hauser v. Ferrell*, 14 F.3d 1338, 1341-43 (9th Cir. 1994), *overruled on other*

*grounds by Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 173

(1994) (holding that there is no private right of action for aiding and

abetting under section 10(b) of the 1934 Act, 15 U.S.C. § 78j

(1988)), as applied in *Stat-Tech Liquidating Tr. v. Fenster*, 981 F.

Supp. 1325, 1337-38 (D. Colo. 1997). As noted by the district

court, *Hauser* established, and *Stat-Tech* applied, an exception to

the test for control person liability where a registered representative

engaged in conduct outside the broker-dealer's statutory control.

Specifically, where the undisputed evidence established all of the

following facts, the broker-dealer could not be considered a control

person for its registered representative's conduct as a matter of law:

> (a) the registered representative did not make use of the broker-dealer's access to the securities market to promote or effectuate the sale of the violating security; (b) the broker-dealer had no knowledge of the complained-of transaction; (c) the security being sold by the registered representative was unrelated to any securities sold or offered by the broker-dealer; and (d) the plaintiff did not rely on the registered representative[']s relationship with the broker-dealer in making his/her division to invest in the security.

¶ 12    The district court next concluded that the following evidence

was undisputed in this case: (a) Sorenson did not make use of

6

Southeast's access to the securities market to promote or effectuate the sale of the violating security in this case; (b) Southeast had no knowledge of Sorenson's conduct; (c) the securities being sold by Sorenson were unrelated to any securities sold or offered by Southeast; and (d) Houston did not rely on Sorenson's relationship with Southeast in making her decision to invest in the challenged securities transaction.[4] Applying these undisputed facts to the test articulated in *Hauser* and *Stat-Tech*, the district court concluded that, as a matter of law, Southeast was not a control person with regard to Sorenson's conduct underlying Houston's securities fraud claim and, therefore, Southeast was entitled to summary judgment as a matter of law.[5]

¶ 13    Houston now appeals.

## II.    Standard of Review

¶ 14    We review de novo a grant of summary judgment. *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1212 (Colo. 2008). Summary judgment is appropriate only if the pleadings and

---

[4] Houston does not dispute any of these facts on appeal.
[5] The court also entered summary judgment for Southeast on Houston's claim for common law negligence, but Houston has not challenged that ruling on appeal.

supporting documentation demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  C.R.C.P. 56(c); *W. Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo. 2002).  In determining whether summary judgment is proper, we give the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party.  *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 146 (Colo. 2007).

¶ 15    The moving party has the initial burden to show that there is no genuine issue of material fact.  *Greenwood Tr. Co. v. Conley*, 938 P.2d 1141, 1149 (Colo. 1997).  When a party moves for summary judgment on an issue upon which the party would not bear the burden of persuasion at trial, the moving party's initial burden of production may be satisfied by showing an absence of evidence in the record to support the nonmoving party's case.  *Casey v. Christie Lodge Owners Ass'n*, 923 P.2d 365, 366 (Colo. App. 1996).  "[O]nce the moving party has met its initial burden of production, the burden shifts to the nonmoving party to establish that there is a triable issue of fact."  *Greenwood Tr.*, 938 P.2d at 1149.  Failure to

meet that burden will result in summary judgment in favor of the moving party. *Casey*, 923 P.2d at 366.

### III. Applicable Law

¶ 16 The only issue in this case is whether, under the circumstances here, Southeast is liable as a "controlling person" for Sorenson's fraudulent conduct pursuant to section 11-51-604(5)(b) of the Colorado Act. No Colorado state court has articulated the appropriate analytical framework for analyzing such claims. Accordingly, Houston's contention presents a matter of first impression.

¶ 17 "In the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry, the 73d Congress enacted two landmark pieces of securities legislation: the Securities Act of 1933 (1933 Act) and the Securities Exchange Act of 1934 (1934 Act)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 170-71 (1994). Together, these acts were designed to promote greater accountability in the securities market by providing investors with express and implied private rights of action against securities brokers and others —

effectively creating "an extensive scheme of civil liability."  *Id.* at 171.

¶ 18     As pertinent here, in addition to allowing fraud claims to be asserted directly against individual securities brokers, the 1934 Act permitted investors to assert fraud claims against persons, including brokerage firms, who controlled the person directly liable for the fraud.[6]  Specifically, section 20(a) of the 1934 Act provides:

> Every person who, directly or indirectly, *controls* any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the [SEC] in any action [it brings]), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added).

---

[6] "A broker-dealer is a person or company that is in the business of buying and selling securities — stocks, bonds, mutual funds, and certain other investment products — on behalf of its customers (as broker), for its own account (as dealer), or both.  Individuals who work for broker-dealers — the sales personnel whom most people call brokers — are technically known as registered representatives." Financial Industry Regulatory Authority, *Brokers* (2017), *available at* https://perma.cc/PR7U-CTQQ.

¶ 19    Section 11-51-604(5)(b) of the Colorado Act is nearly coterminous with section 78t(a).  It reads:

> Every person who, directly or indirectly, *controls* a person liable [for securities fraud] is liable jointly and severally with and to the same extent as such controlled person, unless such controlling person sustains the burden of proof that such person acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action.

(Emphasis added).

¶ 20    Although the respective control person liability provisions in the Colorado Act and the 1934 Act are relatively straightforward, neither statute defines the term "control."  Indeed, the only operative definition of "control" is found in the SEC's regulations, which define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405 (2016).  However, even the SEC's definition provides little guidance regarding the scope of a broker-dealer's control person liability.  Accordingly, the scope of "control" has been subject to extensive interpretation by courts nationwide.  *See, e.g.,* Alan R. Bromberg &

11

Lewis D. Lowenfels, *Securities Fraud* §§ 7:339, 7:340, 7:345-:347, 7:358, Westlaw (2d ed., database updated Dec. 2016).

¶ 21 The seminal case construing the term "control" under section 20(a) of the 1934 Act, in the context of a broker-dealer/registered representative relationship, is *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990) (en banc). In *Hollinger*, the Court of Appeals for the Ninth Circuit was presented with the question whether a broker-dealer could be held liable for the fraudulent conduct of its registered representative when that representative was an independent contractor and not an employee. *Id.* at 1566. The court answered that question in the affirmative, holding that, as a matter of law, "a broker-dealer is a controlling person under § 20(a) with respect to its registered representatives." *Id.* at 1573.

¶ 22 Importantly, however, in *Hollinger*, the Ninth Circuit recognized that a broker-dealer is not in statutory control of, and therefore not liable under section 20(a) of the 1934 Act for, *all* fraudulent conduct by its registered representatives:

> By recognizing this control relationship, we do not mean that a broker-dealer is vicariously liable under § 20(a) for all actions taken by its registered representatives. Nor are we making the broker-dealer the "insurer" of its

12

representatives, which is a result we [have previously rejected] . . . as going beyond the scope of the vicarious liability imposed upon a broker-dealer by § 20(a).

*Id.* at 1575.  For instance, the court explained that

> [t]he broker-dealer may also, of course, rely on a contention that the representative was acting *outside* of the broker-dealer's statutory "control."  For example, [the broker-dealer] could argue that when [the investors] entrusted their money to [the registered representative,] they were not reasonably relying upon him as a registered representative of [the broker-dealer], but were placing the money with [him] for purposes *other* than investment in markets to which [he] had access only by reason of his relationship with [the] broker-dealer.

*Id.* at 1575 n.26 (emphasis added).[7]  *Hollinger* itself did not involve "selling away" or outside business.  However, in acknowledging this

---

[7]  The *Hollinger* court's language on the matter of outside business reflects the general trend in the case law that "the courts do not hold the firm liable.  The rationale [for this result] is usually that the claimed loss resulted from a private transaction consummated outside of the normal customer-broker relationship and therefore outside of the normal brokerage firm-salesman control relationship."  Alan R. Bromberg & Lewis D. Lowenfels, *Securities Fraud* § 7:341, Westlaw (2d ed., database updated Dec. 2016) (citing *Hauser v. Farrell*, 14 F.3d 1338, 1343 (9th Cir. 1994) (discussing evidence necessary to impose vicarious liability on broker-dealer), *overruled on other grounds by Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 173 (1994) (holding that there is no

scenario, the court signaled that such a situation would inevitably be presented to the court for consideration. *Id.*

¶ 23     The opportunity to do so was presented a few years later, in Hauser. In Hauser, investors sued a registered representative for securities fraud and, under section 20(a) of the 1934 Act, also sued the representative's brokerage firm. 14 F.3d at 1339. The primary question at issue was whether the broker-dealer was entitled to summary judgment on the grounds that it was not a controlling person because, under the exception recognized in Hollinger, "the representative was acting outside of the broker-dealer's statutory 'control.'" Id. at 1341 (quoting Hollinger, 914 F.2d at 1575 n.26). The Ninth Circuit noted that it had "not previously had occasion to consider what conduct by a representative is 'outside of the broker-dealer's statutory control,'" id. at 1341 (quoting Hollinger, 914 F.2d at 1575 n.26), and it established the following four-part

---

private right of action for aiding and abetting under section 10(b) of the 1934 Act, 15 U.S.C. § 78j); *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 393-95 (4th Cir. 1979) (same); *Sennott v. Rodman & Renshaw,* 474 F.2d 32, 39-40 (7th Cir. 1973) (same); *Lake v. Kidder Peabody & Co.,* No. S 75-147, 1978 WL 1101, at *12-15 (N.D. Ind. May 22, 1978) (unpublished opinion) (same)).

test for determining whether a registered representative's actions were outside the scope of the broker-dealer's control:

1. Whether the investor(s) reasonably relied on the registered representative's relationship with the broker-dealer in making their investment.

2. Whether the investor(s) invested in markets other than those promoted by the broker-dealer.

3. Whether the registered representative relied on its relationship with the broker-dealer to access that investment market on behalf of the investors.

4. Whether the broker-dealer knew of or had a financial interest in the investor's business with the registered representative.

*Id.* at 1341-43.

¶ 24      In light of the undisputed evidence in the record in *Hauser* and the four-part test announced therein, the court concluded that the brokerage firm was not in control of — and, therefore, not liable for — the fraudulent conduct of its registered representative. Accordingly, the court affirmed summary judgment in the brokerage firm's favor. *Id.* at 1339, 1342-43. Together, *Hollinger* and *Hauser*

established the Ninth Circuit's analytical framework for addressing broker-dealer control person liability claims under section 20(a) of the 1934 Act.

¶ 25 The Court of Appeals for the Tenth Circuit appears to have adopted *Hollinger*'s basic concept of control person liability, albeit not in the context of a broker-dealer/registered representative relationship. For example, in *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891, 896-97 (10th Cir. 1992), *rev'd on other grounds sub nom. Cent. Bank of Denver*, 511 U.S. 164, the Tenth Circuit concluded that a plaintiff could establish a prima facie case of control person liability where the plaintiff demonstrated that (1) a primary violation of securities fraud occurred and (2) the defendant had a control person relationship with the primary violator, subject to the defendant's good faith affirmative defense. *Id.* As noted, however, *Pring* did not involve a broker-dealer relationship with its registered representatives, nor has the Tenth Circuit addressed the applicability of the *Hauser* "outside acts" exception.

¶ 26 The Federal District Court for the District of Colorado has addressed these issues and, in doing so, adopted the *Hauser* exception. *Stat-Tech*, 981 F. Supp. at 1337. In *Stat-Tech*, a

registered representative of a broker-dealer induced various investors to purchase shares in a corporation by "grossly overstat[ing]" its revenues. *Id.* at 1334. Less than a year later, the corporation filed for bankruptcy. *Id.* Among other parties, the investors sued the broker-dealer under section 20(a) of the 1934 Act and section 11-51-604(5)(b) of the Colorado Act. *Id.* at 1336-37.

¶ 27 The broker-dealer moved for summary judgment, arguing that the investors could not make a sufficient evidentiary showing that the firm was in control of its registered representative for purposes of control person liability. *Id.* In a lengthy written recommendation, a federal magistrate judge — who oversaw the pretrial litigation of the case — recommended that the district court deny the motion for the following reasons.

¶ 28 First, the magistrate judge concluded that section 11-51-604(5)(b) of the Colorado Act and section 20(a) of the 1934 Act were substantially similar and, therefore, federal precedent was persuasive in analyzing both claims. *Id.* at 1337. Next, the magistrate judge applied *Hollinger* and *Pring*, stating that "[i]n order to establish a *prima facie* case of control person liability, the plaintiff must present evidence from which a reasonable fact finder

could conclude that (a) a primary violation of the securities laws occurred; and (b) the defendant controlled the person or entity committing the primary violation." *Id.* (citing *Pring*, 969 F.2d at 896). Finally, the magistrate judge examined and applied the four-part *Hauser* exception to determine whether the broker-dealer was in control. *Id.* at 1338. In so doing, the magistrate judge determined, contrary to the facts in *Hauser*, that the evidentiary record supported a conclusion that (1) the plaintiffs relied on the registered representative's relationship with the brokerage firm in deciding to make their investment and (2) the brokerage firm promoted the same type of securities that were sold by its representative to the plaintiffs. *Id.* The magistrate judge thus concluded that, under *Hauser*, the broker-dealer was in control of the representative and, therefore, recommended that the defendant's motion for summary judgment on that basis be denied. *Id.* at 1338-39. The district court summarily adopted the magistrate judge's recommendation and analysis on this issue. *Id.* at 1333.

IV.  Analysis

¶ 29  Houston contends that Southeast was in control of Sorenson with regard to his conduct underlying this case and that the district court erred by applying the *Hauser* exception in its analysis.  We disagree.

¶ 30  For the following reasons, we are persuaded by the analyses set forth in *Hollinger*, *Hauser*, and *Stat-Tech*, and conclude that, together, these cases provide an instructive analytical framework for analyzing control person liability claims, in the context of the broker-dealer/registered representative relationship, under section 11-51-604(5)(b).

¶ 31  Initially, as noted above, the language of section 11-51-604(5)(b) of the Colorado Act is substantially similar to its federal counterpart, section 20(a) of the 1934 Act.  Therefore, "[w]hile this court is not bound by federal law in the interpretation of the Colorado Securities Act, we find that insofar as the provisions and purposes of our statute parallel those of the federal enactments, such federal authorities are highly persuasive."  *Lowery v. Ford Hill Inv. Co.*, 192 Colo. 125, 129, 556 P.2d 1201, 1204 (1976).  Indeed, the Colorado Act specifically declares:

> The provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article and rules and regulations promulgated under those federal acts and statutes, to the extent coordination is consistent with both the purposes and the provisions of this article.

§ 11-51-101(3), C.R.S. 2016.

¶ 32    Because no Colorado appellate case has considered the applicable framework for control person liability claims under section 11-51-604(5)(b), we conclude that the analysis set forth in *Stat-Tech*, together with the *Hollinger* and *Hauser* framework, constitute highly persuasive authority to decide the issue before us in this case.  *See* § 11-51-101(2); *see also Lowery*, 192 Colo. at 129-30, 556 P.2d at 1204.

¶ 33    In our view, the analyses and reasoning in these cases strike an appropriate balance between the competing public policies reflected in the Colorado Act, which are "to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." § 11-51-101(2); *see also Hollinger*, 914 F.2d at 1574-75.  We further note that section 11-51-604(5)(b) is "remedial in nature and is to be

20

broadly construed to effectuate its purposes." § 11-51-101(2). This balance recognizes that, in general, a broker-dealer will be a control person of its registered representatives, thus promoting the remedial purpose of the Colorado Act; but, at the same time, in the context of outside business (or "selling away"), this balance furthers the statutory policy articulated in *Hollinger* and *Hauser*, that broker-dealers are not meant to be insurers of their registered representatives in all cases.

¶ 34    Accordingly, we conclude that the framework for analyzing claims under section 11-51-604(5)(b) is as follows: a plaintiff establishes a prima facie case of control person liability where the plaintiff demonstrates that (1) a primary violation of securities fraud occurred and (2) the defendant was a controlling person. As a general rule, a broker-dealer is statutorily in control of its registered representatives as a matter of law. *See Hollinger*, 914 F.2d at 1574; *see also Pring*, 969 F.2d at 897. Of course, even when a broker-dealer is found to be a controlling person, liability is still subject to the broker-dealer's affirmative defense of good faith. § 11-51-604(5)(b).

¶ 35    However, we also recognize an exception to control where, as in *Hauser*, a broker-dealer is not in statutory control of its registered representative's underlying conduct when all of the following factors are undisputed:

1. The plaintiff(s) did not reasonably rely on the registered representative's relationship with the broker-dealer in making their investment.

2. The plaintiff(s) invested in markets other than those promoted by the broker-dealer.

3. The registered representative did not rely on its relationship with the broker-dealer to access the securities market in order to sell the subject securities to the plaintiff(s).

4. The broker-dealer did not know of, or have a financial interest in, the investor's business with the registered representative.

*See Hauser*, 14 F.3d at 1342-43; *Stat-Tech*, 981 F. Supp. at 1337; *see also Fraioli v. Lemcke*, 328 F. Supp. 2d 250, 273 (D.R.I. 2004) (finding no control person liability for a broker-dealer where the plaintiffs dealt exclusively with the registered representative, relied

on their close relationship with him, and where the broker-dealer was unaware of, and did not benefit from, the transaction at issue); *Mosley v. Am. Exp. Fin. Advisors, Inc.*, 230 P.3d 479, 485-87 (Mont. 2010) (applying *Hauser* to determine that a registered representative's actions were "outside the [brokerage] firm's control"). In such cases, the broker-dealer, as a matter of law, cannot be a controlling person of its registered representative.

¶ 36    We now apply this analytical framework to the undisputed facts of this case.

¶ 37    Here, the parties do not dispute that Sorenson's conduct in this case involved a primary violation of securities fraud under the Colorado Act. Thus, the only remaining issue is whether Southeast was a controlling person under section 11-51-604(5)(b). The district court found, and — based on our de novo review of the record, *see Georg*, 178 P.3d at 1212 — we agree, that the following facts are undisputed:[8]

- Sorenson hid his conduct in this case from Southeast, by failing to notify Southeast of his outside securities sales

---

[8] Indeed, Houston appears to concede that these facts are undisputed in her briefs on appeal.

on behalf of CFS and by using undisclosed, private e-mail accounts to engage in the subject transactions.

- No one from Southeast knew about Sorenson's involvement with Houston.

- Sorenson did not use Southeast's access to the securities markets to promote or conduct his deals with Houston (through Hornick), since CFS was a private venture created and owned by Sorenson.

- Southeast never held any of Houston's money because Sorenson never opened a Southeast account for Houston. Southeast accordingly had no financial interest in Houston's investments with Sorenson.

- Prior to February 2014, Houston had not heard of Southeast, nor did she have any knowledge of Sorenson's relationship with Southeast. Therefore, she did not rely on Sorenson's relationship with Southeast in deciding to invest with Sorenson, indirectly through Hornick, in 2013.

¶ 38 Thus, under the *Hauser/Stat-Tech* control person analysis applicable here, we conclude that Southeast was not in control of

24

Sorenson with respect to his conduct underlying this case. Even construing all reasonable inferences in Houston's favor, there is simply no genuine issue of material fact regarding any of the four factors of the "outside acts" exception and, therefore, Southeast was entitled to judgment as a matter of law on the issue of control. C.R.C.P. 56(c); *W. Elk Ranch*, 65 P.3d at 481. We accordingly perceive no error by the district court in applying the *Hauser/Stat-Tech* analysis or granting Southeast's motion for summary judgment on this basis.

¶ 39 Notwithstanding the substantial persuasive authority on the issue of control discussed above, Houston contends that we should not adopt the *Hauser/Stat-Tech* exception because it does not take into consideration Southeast's affirmative obligations to adequately supervise Sorenson. Indeed, the heart of Houston's contention on appeal is that a broker-dealer's failure to supervise its registered representatives is relevant in the control analysis, and we should include it in the analytical framework for addressing such claims, even in the context of outside business or "selling away." We disagree.

¶ 40 To the extent that a control person has purportedly failed to adequately supervise its registered representatives — in contravention of SEC, Financial Industry Regulatory Authority, or state regulations, or internal policies — we conclude that such evidence is more appropriately considered in analyzing a broker-dealer's affirmative good faith defense under section 11-51-604(5)(b).[9] Our view on this issue comports with the majority of authorities who have addressed it. *See, e.g.*, Bromberg & Lowenfels at § 7:358 ("The broker-dealer's defense that it established, maintained and enforced a proper system of supervision and control" is relevant to its good faith defense under section 20(a) of the 1934 Act.).

¶ 41 Here, because Houston failed to establish Southeast's control over Sorenson under the *Hauser/Stat-Tech* exception, we need not

---

[9] We express no opinion on the relevance of such alleged failures as to common law claims against the broker-dealer. *Cf. Dolin v. Contemporary Fin. Sols., Inc.*, No. 08-CV-00675-WYD-BNB, 2010 WL 5014498, at *3-6 (D. Colo. Dec. 3, 2010) (unpublished opinion) (discussing the broker-dealer's supervisory obligations in addressing the plaintiff's various common law claims against it); *Asplund v. Selected Invs. in Fin. Equities, Inc.*, 103 Cal. Rptr. 2d 34, 41-51 (Cal. Ct. App. 2000) (discussing the broker-dealer's supervisory obligations in relation to its purported duty of care under plaintiff's negligence per se claim against it).

determine how, if at all, Southeast's alleged failure to adequately supervise Sorenson would impact any good faith defense it might have raised under section 11-51-604(5)(b).

¶ 42    We also reject Houston's argument in her reply brief that consideration of the broker-dealer's knowledge under the fourth factor of the *Houser* exception effectively eviscerates the need for the broker-dealer's affirmative good faith defense under section 11-51-604(5)(b).  To the contrary, where the evidence shows that any one of the four factors of the outside business exception is in dispute, the exception would be inapplicable and summary judgment for the broker-dealer would be inappropriate.  *See Stat-Tech*, 981 F. Supp. at 1338-39.  In such circumstances, where a plaintiff establishes a prima facie case of control person liability, the broker-dealer could still raise the good faith affirmative defense, and all relevant evidence of the broker-dealer's supervision (or lack thereof) could be considered in the analysis of that defense.

## V.    Conclusion

¶ 43    The judgment is affirmed.

JUDGE DAVIDSON and JUDGE NIETO concur.